# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## DURHAM DIVISION

| | |
|---|---|
| MARY JANE BEAUREGARD, On Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SMART ONLINE, INC., DENNIS MICHAEL NOURI, REEZA ERIC NOURI, HENRI NOURI, RONNA LOPRETE, NICHOLAS A. SINIGAGLIA, SCOTT WHITAKER, DAVID E.Y. SARNA, FRANK COLL, C. JAMES MEESE, JR., PHILIPPE POUPONNOT, JEFFREY W. LEROSE, THOMAS P. FURR, SHERB & CO., LLP, RUBEN SERRANO, ALAN LUSTIG, ANTHONY MARTIN, JAMES DOOLAN, MAXIM GROUP, LLC, and JESUP & LAMONT SECURITIES CORP. and JOHN DOE 1 through 5, <br><br> Defendants. | Civ. No. 07-CV-00785-WO-PTS <br><br> CLASS ACTION COMPLAINT <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>INTRODUCTION</u>

1.  Court-appointed Lead Plaintiff, Mary Jane Beauregard ("Lead Plaintiff"), brings this federal securities law class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all those who purchased Smart Online, Inc. ("SOI", "Smart Online", or "Company") securities from

May 2, 2005 through September 28, 2007, inclusive ("Class Period"), and who were damaged thereby ("Class"). This suit seeks remedies under the Securities Exchange Act of 1934 ("Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder arising out of defendants' misconduct alleged more fully below.

## OVERVIEW OF THIS ACTION

2. As described herein, certain of the defendants orchestrated and participated in a fraudulent and illegal scheme to manipulate artificially the public securities market for Smart Online stock by, inter alia, paying and accepting bribes and other illegal consideration to solicited investors to purchase SOI securities for the purpose of creating the false appearance of a larger market interest in SOI and thereby fraudulently induced investors into buying Smart Online stock. This scheme involved management of SOI bribing stock brokers. The bribed brokers solicited purchases of more than 267,000 shares of SOI stock from investors, which accounted for approximately 10% of the trading volume from May 2005 to January 2006.

3. During that period, defendants did not disclose any details of the underlying bribery and kickback scheme, or defendants' overarching scheme to artificially inflate the volume and price of Smart Online's shares. Instead, through false and misleading statements and omissions of material information, defendants concealed the illegal payments by portraying them as innocuous-sounding consulting or investor relation fees and agreements. These consulting and investor relation fees and agreements were, in

2

fact, nothing more than disguised illegal payments to the brokers to induce and compensate them to actively participate and effectuate the illegal manipulation of SOI's shares.

4.     SOI began trading on the National Association of Securities Dealers' Over-the-Counter Bulletin Board ("OTC BB") on April 15, 2005, with an opening stock price of $1.50 per share.  The OTC BB "is a regulated quotation service that displays real-time quotes, last-sale prices, and volume information in over-the-counter (OTC) equity securities."  The OTC BB requires that "[o]nly Market Makers can apply to quote securities on this service."   See "Overview and History of the OTC BB," available at http://www.otcbb.com/aboutOTCBB/overview.stm#abouthistory (last accessed August 1, 2008).  In addition, "issuers of all securities quoted on the OTCBB are subject to periodic filing requirements with the SEC or other regulatory authority."  Furthermore:

The OTCBB:

- provides access to more than 3,300 securities;

- includes more than 230 participating Market Makers;

- electronically transmits real-time quote, price, and volume information in domestic securities, foreign securities and [American Depositary Receipts]; and

- displays indications of interest and prior-day trading activity in [Direct Participation Programs].

5.     In the ensuing months, defendants concocted and put into effect a scheme to increase stock trading volume and the overall number of shareholders in order to qualify for a listing on the NASDAQ Capital Market ("NASDAQ").  A NASDAQ listing

3

would increase the Company's visibility, reputation, and ability to raise equity financing. Defendants, however, never disclosed the method that would be employed to obtain that valuable and important listing for SOI shares.

6.     Defendants' scheme worked, artificially inflating both SOI's stock price and volume, duping investors into believing SOI was more valuable as an investment and that market interest in SOI was greater than it was, and inducing them into trading the Company's stock, which further inflated the price and volume of SOI's shares. As a result of this fraudulent and manipulative scheme, SOI qualified for a NASDAQ listing.

7.     On January 17, 2006, however, the day that the Company was scheduled to begin trading on NASDAQ, the SEC issued an Order of Suspending of Trading, stating:

> It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of Smart Online, Inc. ("SOLN") because of possible manipulative conduct occurring in the market for the company's stock. [Emphasis added.]

> The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

> Therefore, it is ordered, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is suspended for the period from 9:30 a.m. EST, on January 17, 2006 through 11:59 p.m. EST, on January 30, 2006.

8.     Defendants manipulated the Company's stock price through the broker bribery scheme, where bribes were made with the intent to artificially inflate the price of SOI stock, increase the total number of shareholders, and artificially support trading volumes. As the average monthly volumes of Company stock during the relevant period

4

demonstrate, defendants accomplished their goals, until the SEC suspension. Average monthly volume of Company shares traded, from the time Smart Online first began public trading (April 2005) until the date of the SEC suspension (which includes all of January 2006), are as follows: April (11,500); May (10,200); June (10,100); July (10,500); August (18,700); September (20,500); October (26,800); November (13,200); December (17,500); and, January (4,300).

9.      In response to the Order of Suspending of Trading, NASDAQ rescinded SOI's qualification and the OTC BB suspended SOI from trading on January 24, 2006. Thereafter, SOI began trading on the Pink Sheets, until the Company again obtained a listing on the OTC BB on September 11, 2006.

10.      In March 2006, the Company allegedly tasked its Audit Committee and outside legal counsel to conduct an allegedly independent internal investigation of matters relating to the SEC suspension. On July 7, 2006, without disclosing the actual report authored by the Audit Committee and outside legal counsel, the Company issued a release claiming that no "officers or directors have engaged in fraudulent or criminal activity."

11.      Despite this public pronouncement and reassurance by the Company, supposedly based on the investigation conclusions of the members of the Audit Committee and outside counsel, that no "officers or directors have engaged in fraudulent or criminal activity," on September 11, 2007, after an extensive investigation, the SEC filed an injunctive complaint in the United States District Court for the Southern District

of New York, Docket no. 07-7960 (PKC) (the "SEC Complaint"), naming the following as defendants: Smart Online, Dennis Michael Nouri, Reeza Eric Nouri, Anthony Martin, James Doolan, Ruben Serrano, and Alain Lustig. That same day, Dennis Michael Nouri, Reeza Eric Nouri, Ruben Serrano, Anthony Martin, James Doolan, and Alain Lustig were arrested and charged by the United States in the Southern District of New York with federal securities fraud and conspiracy to commit securities fraud.

12. On November 8, 2007, the United States filed grand jury criminal Indictments (the "Indictments") in the Southern District of New York against Dennis Michael Nouri (Docket no. 1:07-cr-01029-DC-1), Reeza Eric Nouri (Docket no. 1:07-cr-01029-DC-2), Ruben Serrano (Docket no. 1:07-cr-01029-DC-3), and Alain Lustig (Docket no. 1:07-cr-01029-DC-4). On December 20, 2007, defendant Anthony Martin waived Indictment and the United States instead filed an Information that same day. See Docket no. 1:07-cr-01226-DC-1 (Southern District of New York). On February 11, 2008, defendant James Doolan waived Indictment and the United States filed an Information ("Doolan Information"), to which he then pled guilty that same day. See Docket no. 1:08-cr-00113-SHS-1 (Southern District of New York). Collectively, the Indictments and Information(s) will be referred hereinafter as "Federal Criminal Action Charging Papers." The United States Attorney for the Southern District of New York, Michael J. Garcia, in press release issued the day of the arrests, praised the efforts "of the FBI and the SEC" in the investigation of the case.

6

13.     Hereinafter, the SEC action (the "SEC Civil Action"), and the numerous criminal cases brought by the United States Attorney brought in connection with the manipulation of SOI securities will be referred to collectively as the "Government Actions."  Plaintiff incorporates by reference the dockets in the Government Actions herein.

14.     In addition to defendants' devices, scheme and artifice intended to, and which did, defraud investors by manipulating SOI's share price and volume, the defendants published or participated in publishing a series of materially false and misleading statements, each of which is detailed below, which defendants knew or should have known but for their severe recklessness, were materially false and misleading at the time of such publication, and which omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.  Not only did defendants actively and fraudulently conceal the scheme to bribe brokers to induce investors to buy SOI stock, but also defendants, throughout the Class Period, failed to disclose that SOI lacked requisite internal controls and procedures and that its financial reports were seriously flawed, misleading, and lacking in reasonable basis and could not be relied upon.

15.     By virtue of defendants' manipulative conduct and fraudulent misrepresentations and omissions,  investors were deceived by the false pricing and volume caused by defendants into the market;  the underlying economic value of the securities traded were distorted; and, when the truth of this scheme was finally and fully

7

revealed, the price of SOI shares declined and Lead Plaintiff and the members of the Class were damage thereby.

16. The truth about the manipulative conduct, defendants' material misstatements and omissions, and the precise involvement of defendants was revealed in partial stages. After learning in January 2006 that the Company's stock had been afflicted by manipulative conduct, investors then learned, when the Company issued its Form 10-K for the fiscal year ended December 31, 2005 (filed July 11, 2006), about the utter and complete disregard for standards of corporate governance that permeated the Company, including:

(a) Inadequate diligence by management and the Board of Directors regarding third parties with which the Company contracted, including outside investor relations vendors, some of which were registered brokers;

(b) Management and the Company's directors lacked sufficient knowledge regarding rules and regulations with respect to dealings between registered brokers and public companies;

(c) There was inadequate legal and accounting review of material contracts;

(d) There was inadequate training and understanding of SEC disclosure requirements;

(e) There was a failure to communicate and to stress the importance of controls and procedures throughout the Company; and,

8

(f)     Defendant Michael Nouri failed to set and follow proper corporate governance and compliance requirements as Smart Online moved from being a private company to being a public company.

17.     Only on September 11, 2007, on the day several defendants were arrested by federal authorities and the SEC Civil Action was filed, did investors come to realize that the manipulative conduct taking place at the Company was, in fact, at the behest of its Chief Executive Officer, the highest-ranking official at Smart Online.  A little more than two weeks after the arrests, on September 28, 2007, the end of the Class Period, as noted on the docket sheet of the SEC Civil Action, the Company entered into a "Final Judgment," although neither admitting nor denying the allegations in the complaint filed in the SEC Civil Action, restraining and enjoining Smart Online and its agents, servants, employees, attorneys, and all persons acting in concert or participation with them from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 and Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)].

<u>JURISDICTION AND VENUE</u>

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

20.     In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

21.     Each defendant named herein has sufficient minimum contacts with this District, state, or the United States so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b).  Defendant SOI maintains its principal executive offices in this District and many of the acts committed by defendants, including the manipulative conduct and preparation and dissemination of materially false and misleading information, occurred in, or emanated from, in substantial part, this District. Defendants are found, inhabitants of, or transact business in this District.

<u>PARTIES</u>

23.     Lead Plaintiff, Mary Jane Beauregard, appointed by Order of this Court dated June 24, 2008, purchased SOI securities during the Class Period, as set forth in the Plaintiff's Certification listing her transactions in SOI securities attached hereto, and she was damaged thereby.

24.     Defendant SMART ONLINE, INC. (previously defined as "SOI", "Smart Online", or "Company") is a corporation organized and existing under and by virtue of the laws of the State of Delaware.  Smart Online is a leading provider of software applications and tools for small businesses.  SOI develops and markets internet-delivered software-as-service applications and data resources aimed primarily at small businesses.  At all relevant times, SOI's principal offices were located at 2530 Meridian Parkway, 2nd Floor, Durham, North Carolina 27713.

25.     Through December 31, 2006, the Company reported aggregate losses of $57 million since first beginning operations in 1993.  Yet, during the Class Period, the Company made three significant acquisitions, including the rights to an accounting software engine from a software development company in August 2005, Computility, Inc. in October 2005, and iMart, Inc. also in October 2005.  The Computility, Inc. acquisition was funded through the Company's issuance of 484,213 shares as consideration, and the assumption of certain liabilities.  The iMart, Inc. acquisition was funded partly through the issuance of 205,767 shares of Company stock to iMart, Inc. shareholders.

26.     Despite the Company's problems, one of SOI's stated goals for 2006 was to "identify acquisitions that allow us to expand the products we offer and to grow our customer base[.]"  The Company continually conceded in public filings with the SEC that its "primary source of liquidity" came from the sale of Smart Online securities.  As the

11

company used its stock as the primary source of currency for its acquisitions and accordingly its growth, increasing the value and liquidity of its stock was essential to Smart Online's survival and future prosperity.

27.     The Company filed with the SEC on May 3, 2005  Post-Effective Amendment No. 1 on Form S-1 to Form SB-2 Registration Statement (Form S-1").  The Company also made numerous other quarterly and annual filings with the SEC during the Class Period, discussed in greater detail below, including the following:

Form 10-Qs

- Form 10-Q for the quarter ended March 31, 2005 (filed May 16, 2005) ("Q1:05 10-Q")

- Form 10-Q for the quarter ended June 30, 2005 (filed August 15, 2005) ("Q2:05 10-Q")

- Form 10-Q for the quarter ended September 30, 2005 (filed November 14, 2005) ("Q3:05 10-Q")

- Form 10-Q for the quarter ended March 31, 2006 (August 2, 2006) ("Q1:06 10-Q")

- Form 10-Q for the quarter ended June 30, 2006 (filed August 25, 2006) ("Q2:06 10-Q")

- Form 10-Q for the quarter ended September 30, 2006 (filed November 14, 2006) ("Q3:06 10-Q")

- Form 10-Q for the quarter ended March 31, 2007 (filed May 15, 2007) ("Q1:07 10-Q")
- Form 10-Q for the quarter ended June 30, 2007 (filed August 14, 2007) ("Q2:07 10-Q")

- Form 10-Q for the quarter ended September 30, 2007 (filed November 14, 2007) ("Q3:07 10-Q")

Form 10-Ks

- Form 10-K for the fiscal year ended December 31, 2004 (filed April 15, 2005) ("2004 10-K")
- Form 10-K for the fiscal year ended December 31, 2005 (filed July 11, 2006) ("2005 10-K")

- Form 10-K for the fiscal year ended December 31, 2006 (filed March 30, 2007) ("2006 10-K")

- Form 10-K for the fiscal year ended December 31, 2007 (filed March 25, 2008) ("2007 10-K")

## INDIVIDUAL DEFENDANTS

28.     Defendant DENNIS MICHAEL NOURI  ("Michael Nouri") served as President, Chief Executive Officer, Chairman of the Board, and Director of SOI, which he co-founded with his brother, Henry Nouri, in 1993.  Michael Nouri stepped down as Chairman of the Board of Directors of SOI on July 7, 2006, the very day the Company issued a press release revealing the alleged findings of the SOI Audit Committee that purportedly investigated the SEC's suspension, even though that Audit Committee concluded that none of the officers or directors "engaged in fraudulent or criminal activity."

29.     As disclosed by the Company in its SEC filings, Michael Nouri was an officer and director of two companies in Italy ordered into bankruptcy by the Italian courts in 1993 and, under Italian law, he can no longer serve as an officer or director of any Italian company because of these bankruptcies.

13

30.     Michael Nouri conceived; directed and participated directly in the manipulative conduct complained of herein; signed the Company's SEC filings (including the Company's Form S-1, Q1:05 10-Q, Q2:05 10-Q, Q3:05 10-Q, Q1:06 10-Q, Q2:06 10-Q, Q3:06 10-Q, Q1:07 10-Q, Q2:07 10-Q, 2004 10-K, 2005 10-K, and 2006 10-K), which contained misstatements or omissions of material fact, and signed the related Sarbanes-Oxley Act ("SOX") certifications attached to these respective SEC filings.

31.     Defendant RONNA LOPRETE ("Loprete"), the wife of Michael Nouri, served as Secretary and a Director of the Company during the Class Period.  She stepped down as a Director in September 2005.  Loprete signed the Company's 2004 10-K and Form S-1, which described her role at the Company as managing "relationships with legal advisors and develops and defines all corporate and organizational policies," both of which contained misstatements or omissions of material fact.

32.     Defendant HENRI NOURI  (a/k/a HENRY NOURI) (hereafter, "Henri Nouri") co-founded Smart Online in 1993 with his brother, defendant Michael Nouri. Previously, as disclosed by the Company in its SEC filings, Henri Nouri was an officer and director, along with his brother, Michael Nouri, of two companies in Italy "ordered into bankruptcy by the Italian courts in 1993" and, under Italian law, he can no longer serve as an officer or director of any Italian company because of these bankruptcies. Henri Nouri served as the former Executive Vice President (Research and Development)

of SOI and served as a Director during the Class Period. Henry Nouri signed the Company's 2004 10-K, which contained misstatements or omissions of material fact.

33. Defendant REEZA ERIC NOURI ("Eric Nouri") is the brother of defendants Michael and Henri Nouri and a former employee of SOI who worked as an office manager during the Class Period. Eric Nouri participated directly in the manipulative conduct complained of herein.

34. Defendant NICHOLAS A. SINIGAGLIA ("Sinigaglia") was appointed Chief Financial Officer of the Company effective March 21, 2006, a position which also includes functioning as the chief accounting officer of the Company. From August 2005 to February 2006, he acted as an independent business consultant providing accounting and business consulting services as well as interim-CFO services to New York clients. Sinigaglia was an Audit Senior Supervisor with Arthur Andersen LLP from 1991 to 1997 and is a Certified Public Accountant. Sinigaglia signed the Company's SEC filings (including the Company's Q1:06 10-Q, Q2:06 10-Q, Q3:06 10-Q, Q1:07 10-Q, Q2:07 10-Q, 2005 10-K, and 2006 10-K), which contained misstatements or omissions of material fact, and the related SOX certifications attached to these respective SEC filings.

35. Defendant SCOTT WHITAKER ("Whitaker") first began working for the Company in 1998 as an accounting manager, becoming the Controller in 2002, and then receiving a promotion to serve as the Chief Financial Officer and Principal Accounting Officer at SOI, beginning on February 24, 2005. Whitaker became the Company's Controller/Bookkeeper on March 21, 2006, upon Sinigaglia's hiring. Whitaker signed

15

the Company's SEC filings (including the Company's Form S-1, Q1:05 10-Q, Q2:05 10-Q, Q3:05 10-Q, and 2004 10-K), which contained misstatements or omissions of material fact, and the related SOX certifications attached to these respective SEC filings.

36. Defendant JEFFREY LEROSE ("LeRose") served as Chairman of the Board of Directors and a Director of SOI during the Class Period. He was first appointed as a Director on September 13, 2005, replacing Loprete, and continued to serve in that position during the remainder of the Class Period. In July 2006, LeRose became Chairman of the Board after Michael Nouri resigned under the cloud of suspicion bearing on his actions resulting in the Government Actions. LeRose signed the Company's 2005 10-K and 2006 10-K, both of which contained misstatements or omissions of material fact.

37. Defendant THOMAS FURR ("Furr") is Chief Strategy Officer and a Director of SOI. Furr became a Director in 2002 and remained a Director during the Class Period. Furr joined SOI as the vice-president (sales) and became Chief Operating Officer in November 2005. At the Company, Furr had responsibility for developing and implementing strategies to leverage existing direct and indirect distribution channels, and SOI's operational and sales areas. Furr signed the Company's Form S-1, 2004 10-K, 2005 10-K, and 2006 10-K, all of which contained misstatements or omissions of material fact.

38. Defendant DAVID E.Y. SARNA ("Sarna"), a Director of the Company during the Class Period, he resigned from that position, effective June 23, 2006, just two

weeks before the Company issued a brief summary of the findings of the Audit Committee investigation of the SEC's suspension of trading.

39.     Defendant FRANK COLL ("Coll"), a Director of the Company during the Class Period, beginning in April 2005.  Prior to affiliating with SOI, Coll served as President and Principal of a private management consulting company from November 2001 to February 2005.  He resigned his position as a Director on March 5, 2006 during the height of the pendency of the Audit Committee investigation of the SEC's suspension of trading.

40.     Defendant C. JAMES MEESE, JR. ("Meese"), a Director of the Company during the Class Period.  Meese signed the Company's Form 10-K for the fiscal year which ended December 31, 2006.

41.     Defendant SHLOMO ELIA ("Elia"), a Director of the Company during the Class Period.  Elia signed the Company's Form 10-K for the fiscal year ended December 31, 2006.  Atlas Capital SA, one of the Company's major investors, recommended Elia's election to the Board of Directors.

42.     Defendant PHILIPPE POUPONNOT ("Pouponnot"), a Director of the Company during the Class Period.  Pouponnot signed the Company's Form 10-K for the fiscal year ended December 31, 2006.  Blueline Fund, one of the Company's major investors, recommended Pouponnot's election to the Board of Directors.

43.     The Officers and/or Directors of the Company identified above in ¶¶ 26-40 are hereinafter referred to collectively as the "Individual Defendants."  According to the

Company's SEC filings, "[o]ur executive officers are appointed by our board of directors to hold office until their successors are appointed." Furthermore, by virtue of their respective positions, each of the Individual Defendants had a duty not to engage in manipulative conduct and/or to fully disclose all material facts, but failed or omitted to disclose material facts, which harmed the members of the Class. The Individual Defendants and defendant SOI are collectively referred to as the "Smart Online Defendants."

## AUDITOR DEFENDANT

44.     Defendant SHERB & CO., LLP ("Sherb") served as Smart Online's outside auditor from April 3, 2006. Sherb audited the Company's financial statements and issued an unqualified opinion, despite the fact Sherb knew of material information related to defendants and the government investigations leading to the Government Actions. As noted by the Company in recounting the Company's parade of auditors over a five month span:

> In November 2005, the Audit Committee of our Board of Directors approved a change in its independent registered public accountant to audit its financial statements. The Audit Committee dismissed BDO Seidman, LLP ("BDO") effective November 15, 2005. The Audit Committee appointed Goldstein Golub Kessler LLP ("GGK") to serve as our independent registered public accountants, effective November 15, 2005. GGK replaced BDO.

> \*       \*       \*

> In March 2006, the Audit Committee of our Board of Directors approved a change in its independent registered public accountant to audit its financial statements. GGK resigned as the Company's independent accountant, effective March 16, 2006. GGK notified us on March 17, 2006. Due to the

short duration of GGK's retention as our outside accounting firm, GGK
never provided a report on our financial statements.

*     *     *

On April 3, 2006, the Audit Committee of our Board of Directors engaged
Sherb & Co., LLP ("Sherb") as our new independent registered public
accountant to be the principal independent accountant to audit its financial
statements.

45.     Furthermore, the Company attached BDO's "Report of Independent

Registered Public Accounting Firm," dated February 28, 2005, to Form S-1.  That report

stated as follows:

[T]he Company has suffered recurring losses from operations and at
December 31, 2004 had deficiencies in working capital and equity that raise
substantial doubt about its ability to continue as a going concern.

Unlike BDO, Sherb issued an unqualified opinion, although it had no basis to do so.  The

Consolidated Notes to Financial Statements for the Years Ended December 31, 2004,

2003 and 2002 ("Consolidated Notes"), made a part of Form S-1, recapitulates BDO's

warning that "Smart Online may be unable to continue as a going concern."  The

Consolidated Notes also state:

Smart Online's continuation as a going concern is dependent upon its
ability to generate sufficient cash flows to meet its obligations on a timely
basis, to obtain additional financing as may be required and ultimately to
attain profitable operations and positive cash flows.

46.     Notably, Sherb's audit opinion never expressed any of the concerns that led

BDO to issue tersely-stated qualified opinions.

47.    Defendant RUBEN SERRANO ("Serrano"), a resident of Jersey City, New Jersey, worked as a broker for Maxim at relevant times during the Class Period. Upon information and belief, based on the Criminal Action Charging Papers, Serrano was an actual participant in and part and parcel of the manipulative scheme complained of herein.

48.    Defendant ALAN LUSTIG ("Lustig"), a resident of Massapequa, New York, worked as a broker for JLSC. Upon information and belief, based on the Criminal Action Charging Papers, Lustig was an actual participant in part and parcel of the manipulative scheme complained of herein.

49.    Defendant ANTHONY MARTIN ("Martin"), a resident of Jersey City, New Jersey, worked as a broker for Maxim between October 2002 and June 2006. Upon information and belief, based on the Criminal Action Charging Papers, Martin was an actual participant in part and parcel of the manipulative scheme complained of herein.

50.    Defendant JAMES DOOLAN ("Doolan"), a resident of Bayville, New York, worked as a broker for Maxim between October 2002 and July 2006. Upon information and belief, based on the Criminal Action Charging Papers, both in the Southern District of New York, Doolan was an actual participant in part and parcel of the manipulative scheme complained of herein. Doolan pled guilty to the Information filed against him, and he entered into a partial consent judgment in the SEC Civil Action.

51.     Defendant MAXIM GROUP, LLC ("Maxim") is a registered broker-dealer and investment banking, securities, and money management firm, with its principal offices located at 405 Lexington Ave., New York, New York 10174.  Maxim is listed by the OTC BB as a market maker.  Maxim employed defendants Martin, Doolan, and Serrano, and benefited from the manipulative scheme by charging fees and sales charges to unsuspecting customers.   Defendant Maxim provided facilities for accomplishing the manipulation of SOI shares and Maxim knew or recklessly disregarded the manipulative conduct of defendants Martin, Doolan, and Serrano.

52.     Defendant JESSUP & LAMONT SECURITIES CORP. ("JLSC") is a registered broker-dealer and investment banking firm, with its principal offices located at 650 Fifth Avenue, 3rd Floor, New York, New York 10019.  JSLC is listed by the OTC BB as a market maker.  JLSC employed defendant Lustig, and benefited from the manipulative scheme by charging fees and sales charges to unsuspecting customers. Defendant JLSC provided facilities for accomplishing the manipulation of SOI shares and JLSC knew or recklessly disregarded the manipulative conduct of defendants Lustig.

53.     Defendants Martin, Doolan, Serrano, Lustig, Maxim, JLSC and the DOEs Defendants employed by any of them, are referred to herein collectively as the "Broker Defendants."

DOE DEFENDANTS

54.     Defendant JOHN DOE 1 ("Doe 1") is an individual whose name and residence is unknown.  Upon information and belief, Doe 1 is an  unindicted co-

21

conspirator of defendants who worked as a registered representative of a New York brokerage firm and was an actual participant in the manipulative conduct. Upon further information and belief, based on the Indictment filed in the Criminal Action pending in the Southern District of New York, Doe 1 (known in the Indictment as "CC-1") committed violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

55. Defendant JOHN DOE 2 ("Doe 2") is an individual whose name and residence is unknown. Upon information and belief, Doe 2 is an unindicted co-conspirator of defendants who worked as a registered representative of a New York brokerage firm and was an actual participant in the manipulative conduct. Upon further information and belief, based on the Indictment filed in the Criminal Action pending in the Southern District of New York, Doe 2 (known in the Indictment as "CC-2") committed violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

56. Defendant JOHN DOE 3 ("Doe 3") is an individual whose name and residence is unknown. Upon information and belief, Doe 3 is an unidentified cooperating witness in connection with the Government Actions and was an actual participant in the manipulative conduct. Upon further information and belief, based on the Indictment filed in the Criminal Action pending in the Southern District of New York, Doe 3 (known in

the Indictment as "CW-1") committed violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

57.     Defendant JOHN DOE 4 ("Doe 4") is an individual whose name and residence is unknown.  Upon information and belief, based on the complaint filed in the SEC Civil Suit pending in the Southern District of New York, Doe 4 (known in the SEC complaint as "Individual A") was an actual participant in the manipulative conduct and committed violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

58.     Defendant JOHN DOE 5 ("Doe 5") is an individual whose name and residence is unknown.  Upon information and belief, based on the complaint filed in the SEC Civil Suit pending in the Southern District of New York, Doe 5 (known in the SEC complaint as "Individual B") was an actual participant in the manipulative conduct and committed violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

## SUBSTANTIVE ALLEGATIONS

59.     SOI provides a private-label syndicated online business platform that enables on-demand web delivery of applications and services to small businesses with less than 50 employees.  According to the Company, Smart Online "pioneered the market

for small business software applications" and its products automate and streamline business processes, reduce operating costs, and improve internal controls. Quoting Summit Strategies in a Form 10-Q filing, "Smart Online's proprietary distribution platform enables the vendor to quickly customize for and integrate with its partners' services, making their joint services accessible to customers via a single sign-on." The Company targets financial services, retail, media, and telecommunication industries in its sales and marketing efforts.

60.    SOI stock began trading on the OTC BB on April 15, 2005, opening at a price of $1.50 per share. Soon after obtaining the OTC BB listing, the Company issued a flurry of positive press releases, which had the effect of increasing the per share value of SOI stock.

61.    Three days after the start of the OTC BB listing, for example, on April 18, 2005, the Company issued the following release on PR Newswire touting its industry recognition:

> Summit Strategies a Leading Technology Analyst Recognizes Smart Online as a Top Vendor in Software-as-Services Market
>
> Smart Online(R), Inc. (OTC:SOLN) (BULLETIN BOARD: SOLN) announces Summit Strategies has acknowledged the company as a top pure-play net-native vendor in the Software- as-Services (SaS) market in their recent report written by Phil Wainewright, titled "Software Powered Services: Net-Native Software-as-Services Transforms The ISV Business Model."
>
> Mr. Wainewright's report highlights how the SaS model is going to radically change the landscape of the software industry, "No conventional player can afford to underestimate the transformational impact of the net-native model, nor how radically it will alter the ground rules of the

24

packaged application business. Even though the timescales are lengthy, there is precious little time left for traditional ISVs and other IT industry players to adequately prepare for the scale of change that is going to take place."

62.     Also on April 18, 2005, the Company issued the following release on PR

Newswire boasting of recognition that the Company received from a leading business

trade publication because of the Company's website:

Smart Online is Nominated to the 2005 Spring Forbes Best of the Web

Smart Online(R) Inc. (OTC:SOLN) announces its website has been nominated to the 2005 Spring Forbes Best of the Web.

Forbes Best of the Web noted, "Unlike its competitors, Smart Online doesn't surf for service providers, but offers its own software (the company started out in 1993 as a maker of small business software)."

Forbes Best of Web further indicated, "The strong Learn How To pages give the site some balance as an all-purpose small-business owner's destination; it isn't just about paid services."

63.     The following day, on April 19, 2005, the Company issued the following

release on PR Newswire, again touting the industry's recognition of the Company:

AMI Partners, the Leading Technology Analyst in New York, Recognizes Smart Online as a Top Vendor in Software-as-Services Market

Smart Online(R), Inc. (OTC:SOLN) (BULLETIN BOARD: SOLN) announces AMI Partners has acknowledged the company as a top vendor in the in Small-to-Medium business Software-as-Services (SaS) market in their recent report written by Laurie McCabe, VP SMB Insights and Business Solutions titled "Software-as-Services: Moving On Demand To In Demand With SMBs."

Ms. McCabe report further indicates, "Smart Online is leveraging their channel strategy by partnering with several banks and publishers, such as INC Magazine, Fast Company, BusinessWeek Magazine, JP Morgan, Union Bank of California and Bank One. On the back-end, Smart Online

uses its open standards framework and distribution platform, OneBiz Conductor, to integrate its own online financial, legal, human resources, CRM and other applications with its partners' online services. On the front-end, partners provide their SMB customers with integrated, tailored offerings via their OneBiz Conductor dashboard."

64.     Not surprisingly, based on the positive news emanating from the Company just mere days after the initial listing on the OTC BB, the Company's stock rose from a per share price of $1.50 on the close of its first day of trading, April 15, 2005, to close on the next trading day, April 19, 2005, at $5.75 per share.  On April 20, 2005, SOI stock closed at $5.95 per share, and the per share price continually increased, never experiencing a dip, during the rest of the month.  The last trading day of April 2005, the Company's stock closed at $6.40 per share.

65.     The individual Defendants (including Michael Nouri) remained unsatisfied at the rapid ascendancy of the Company's stock value.  Instead, defendants (including Michael Nouri) sought to qualify SOI for a listing on NASDAQ by increasing the number of shareholders and the trading volume of SOI stock.  Michael Nouri wanted to increase the daily trading volume from approximately 5,000 shares per day to 30,000 shares per day in an effort to increase overall market capitalization.  See SEC Complaint at ¶ 19.  He also sought to increase the number of SOI stockholders with the goal of enlisting a minimum of 400 shareholders of record.  Id. at ¶ 20.

## THE MANIPULATIVE CONDUCT

66.     In order to generate artificial demand for Smart Online stock, defendants Michael Nouri and Eric Nouri, with the knowledge or intentional blindness of the other

Individual Defendants, paid secret bribes, kickbacks, illegal payments to Doe 3, in order to induce defendants Serrano, Lustig, and each of the Doe Defendants to sell Smart Online stock to their respective customers (members of the Class).

67.     Doe 4 was asked by defendant Michael Nouri to help create volume and increase the number of shareholders.  See SEC Complaint at ¶ 21.  Michael Nouri agreed to pay Doe 4 $1,000 for every 1,000 shares of Smart Online stock sold by Doe 4 and the brokers in Doe 4's network, which included defendants Martin, Doolan, Serrano, and Lustig.  Id.  Doe 4 agreed to pay approximately one-half of the money he received from Michael Nouri to the brokers in his network for soliciting customer purchases of Smart Online stock.  Id. at ¶ 22.  To conceal the bribes, SOI and Nouri entered into fictitious agreements with one or more of the Broker Defendants, including an agent of Doe 4.  Id. at ¶ 23.  From May 2005 through January 2006, at least $170,000 in bribes were paid to and received by the Broker Defendants.  Id. at ¶¶ 3, 25.  During this same time frame, the Broker Defendants and Doe Defendants  solicited purchases of at least  267,000 SOI shares from unsuspecting investors, generating massive fees. Id at ¶¶ 3, 25.  This trading volume amounted to approximately 10% of the entire trading volume for SOI securities during the May 2005 through January 2006 time period.  Id at ¶ 3.

68.     To further the manipulative scheme, defendants undertook numerous acts, as noted in the complaint and Indictments filed in the Government Actions, including:

(a)     In early May 2005, Michael Nouri caused the Company to pay Doe 4 a $10,000 payment or bribe as an advance on the first 10,000 Smart Online

shares purchased by customers of Doe 4 and Doe 4's network of bribed brokers, who began soliciting purchases of Smart Online stock from their customers during the last week of May 2005. Id. at ¶ 24. Between May 2005 and January 13, 2006, Michael Nouri caused the Company to pay Doe 4's agent approximately $115,000. Id.

(b)    In July 2005, Michael Nouri entered into a separate bribery arrangement with Doe 5, agreeing to pay Doe 5 between $700 and $1,000 for every 1,000 shares of Smart Online stock purchased by Doe 5's customers. Id. at ¶ 29. Michael Nouri and the Company also entered into a sham consulting agreement with Doe 5 to conceal the bribes. Id. at ¶ 30. Between July 2005 and December 2005, defendant Michael Nouri caused Smart Online to pay Doe 5 approximately $35,000 for soliciting Doe 5's customers to purchase shares of Company stock. Id. at ¶ 31.

(c)    In July 2005, defendant Michael Nouri entered into a separate bribery scheme with defendant Serrano. Id. at ¶ 34. They also entered into a sham consulting agreement to conceal the bribes. Id. Serrano purchased 1,002 shares of Smart Online stock on August 19, 2005, and he accepted cash compensation from one of the Doe Defendants (and/or Doe 3) for that and other previous purchases of SOI stock for Serrano's clients. Indictments at ¶¶ 17(a) and 17(b). Between July 2005 and December 2005, defendants Michael Nouri and Smart Online paid

Serrano approximately $21,000 for soliciting purchases of Smart Online stock from Serrano's customers during that time period. SEC Complaint at ¶ 36.

    (d)    On January 11, 2006, Michael and Eric Nouri met with one of the Doe Defendants (and/or Doe 3 or Doe 4) in New York and discussed the payment arrangements for the bribes and the fact that Doe 4 had already received $115,000 in bribes. Eric Nouri discussed the consulting agreement with Doe 4. Indictments at ¶ 17(c); SEC Complaint at ¶ 27.

    (e)    Two days later, Michael and Eric Nouri spoke on the telephone with one of the Doe Defendants (and/or Doe 3) and, that same day, defendant Lustig accepted $1,000 from one of the Doe Defendants (and/or Doe 3) in exchange for Lustig's purchase of Smart Online stock for his clients. Indictments at ¶¶ 17(d) and 17(e).

    (f)    On January 13, 2006, Doolan was paid approximately $1,000 in exchange for purchasing shares of Smart Online for his brokerage customers. Doolan Information at ¶ 9(a).

    (g)    Michael Nouri spoke with one of the Doe Defendants (and/or Doe 3) on the telephone on January 16, 2006 and met with defendant Serrano and one of the Doe Defendants (and/or Doe 3) in New York on February 8, 2006. Indictments at ¶¶ 17(f) and 17(g).

    (h)    Michael Nouri paid $2,000 to one of the Doe Defendants (and/or Doe 3) on April 19, 2007. Id. at ¶ 17(j).

(i)     Defendant Lustig spoke on the telephone with one of the Doe Defendants (and/or Doe 3) on February 5, 2007 and April 20, 2007.  Id. at ¶¶ 17(i) and 17(k).

(j)     Between May 2005 and January 13, 2006, defendants Michael Nouri and Eric Nouri directed trading in Smart Online stock.  For example, Michael Nouri and Eric Nouri contacted Doe 4 and Doe 5 and instructed them to purchase a specific number of Smart Online shares at a specific price.  SEC Complaint at ¶ 40.  Defendants Michael Nouri and Eric Nouri told Doe 4 and Doe 5 to purchase Smart Online stock at the offer price, in an attempt to raise the price of Smart Online stock.  Id.  Michael Nouri and Eric Nouri often directed Doe 4 and Doe 5 to purchase odd lots (i.e., 101 shares, 201 shares, etc.), which allowed defendant Michael Nouri to track more easily the trades as reported by trading services.  Id.

69.     Rather than disclose the truth regarding manipulative conduct, which would have been an admission of civil and criminal liability, and resulted in an immediate collapse in SOI's share price, Smart Online Defendants conditioned investors into believing that the Company was operating above board, according to plan, and with effective internal controls.  In fact, as subsequently admitted by the Company, SOI lacked reliable mechanisms to detect fraud on any meaningful scale or ferret out any illegal activities.

70.     Moreover, given the illegal and actionable nature of the bribes or illegal payments, Smart Online Defendants and the Broker Defendants failed to disclose any

aspect of the manipulative conduct because, inter alia: (a) the fact that such a revelation would cause investors not to invest in the Company; (b) reducing the Company's per share stock value, which would adversely impact the aggregate value of the stock portfolios held by the Broker Defendants and the Individual Defendants; (c) familial connections of the Individual Defendants and the desire to ensure that none of the family members would face criminal or civil liability; (d) subjecting defendants to criminal and civil liability, including fines and sentences; (e) impeding the ability of Smart Online to raise additional financing to fund growth, operations, and "working needs"; (f) placing defendants' own pecuniary and other interests in jeopardy, including protecting the value of their own held shares of SOI stock and option shares; (g) jeopardizing the Company's plans to acquire other entities or make important stock financed acquisitions; and (h) the Broker Defendants could lose their licenses and ability to continue to do business in the securities markets.

## MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT

71.    On May 3, 2005, the Company filed with the SEC Post-Effective Amendment No. 1 on Form S-1 to Form SB-2 Registration Statement, which included a Prospectus dated May 3, 2005 ("Form S-1"). This document mentioned a potential inability to meet the requirements of "new" laws related to legislation enacted in 2002 (i.e., SOX), and further noted:

> We will incur costs associated with our public company reporting requirements. We also anticipate that we will incur costs associated with recently adopted corporate governance requirements, including requirements under the Sarbanes-Oxley Act of 2002, as well as new rules

implemented by the Securities and Exchange Commission and the NASD. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly. Any unanticipated difficulties in preparing for and implementing these reforms could result in material delays in complying with these new laws and regulations or significantly increase our costs. Our ability to fully comply with these new laws and regulations is also uncertain. Our failure to timely prepare for and implement the reforms required by these new laws and regulations could significantly harm our business, operating results, and financial condition. Our current chief financial officer does not have public company experience. Consequently, we will have greater difficulty complying with public company reporting requirements than most public companies. [Emphasis added.]

72.     Each of the above statements contained in Form S-1 was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or recklessly disregarded the fact that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that the "ability to fully comply with [the] new laws and regulations" was "uncertain" was because Smart Online Defendants did not plan to follow the securities laws and instead undertake manipulative conduct through the bribery scheme complained of herein;

(b)     Smart Online Defendants failed to disclose that the Company suffered from severe and systemic internal and financial control deficiencies and a

failure to communicate and to stress the importance of controls and procedures throughout the Company;

(c)     Smart Online Defendants failed to disclose that they did not plan to increase "legal and financial compliance costs" but, instead, reduced that line item by $71,000, as noted in the Q2:05 10-Q;

(e)     Smart Online Defendants failed to disclose that Michael Nouri, who certified that he designed disclosure and internal controls, was an actual participant of the bribery scheme complained of herein; and,

(f)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret and illegal bribery scheme; (ii) that Smart Online Defendants, Doe defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received.

73.     Form S-1 further stated that:

A market maker received approval in March 2005 to quote our common stock for trading on the Over-the-Counter Electronic Bulletin Board ("OTCBB" or "Bulletin Board"), and trading started during April 2005. There is no assurance that volume trading will develop. Other public markets, such as NASDAQ or a national securities exchange, have qualitative and quantitative listing criteria that we do not currently meet.

These criteria include operating results, net assets, corporate governance, minimum trading price and minimums for public float, which is the amount of stock not held by affiliates of the issuer. [Emphasis added.]

74.     Each of the above statements, made and/or approved by Smart Online Defendants and contained in Form S-1, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew or were severely reckless or intentional blind in not knowing, that the above statements were materially false and misleading or omitted to reveal material information because (a) although the Company noted that it did not "currently meet" NASDAQ listing requirements, Smart Online Defendants had concocted a scheme, accomplished only a few months later, to "meet" NASDAQ listing requirements by manipulating the publicly traded shares of SOI through the bribery and kick-back scheme.

75.     Form S-1 also expressed:

Going Concern.... [M]anagement has plans, which it believes will enable Smart Online to raise capital and generate greater cash flows from operations. However, there can be no assurance that these efforts will be successful. If our efforts are unsuccessful, we may have to cease operations and liquidate our business. [Emphasis added.]

                    *       *       *

Management is actively evaluating additional financing options through existing and new shareholders for 2005[.] [Emphasis added.]

Future Capital Raising and Acquisitions. Although we are currently not a party to any agreement or letter of intent with respect to potential investments in, or acquisitions of, complementary businesses, services or technologies, we may enter into these types of arrangements in the future, which could also require us to seek additional equity or debt financing.

34

Additional funds may not be available on terms favorable to us or at all. If we cannot raise the capital we need, we may be forced to liquidate our business and investors could lose their entire investment.

76. Each of the above statements, made by and/or approved by Smart Online Defendants and contained in Form S-1, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew or were severely reckless in not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a) Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b) Smart Online Defendants failed to disclose that management's plans "to raise capital and generate greater cash flows" and the "active[] [evaluation of] additional financing options through existing and new shareholders" involved the bribery scheme and manipulative conduct complained of herein, not a legitimate business endeavor; and,

(c) Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online

stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received.

77.    In addition to Form S-1, defendants made numerous other statements which omitted or failed to disclose material facts.  The Company filed the Q1:05 10-Q and Q2:05 10-Q, which noted:

> The Company's ability to continue its operations is dependant [sic] upon its raising of capital through equity financing in order to meet its working needs.  [Emphasis added.]
>
>             *         *         *
>
> The Company needs to raise additional capital by the sale of its equity securities or other financing avenues.  Management believes that actions presently being taken to obtain additional funding provides the additional opportunity for the Company to continue as a going concern.  [Emphases added.]

78.    Each of the above statements, made and/or approved by Smart Online Defendants and contained in the Q1:05 10-Q and Q2:05 10-Q, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew or were severely reckless in not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)     Smart Online Defendants failed to disclose that "actions presently being taken to obtain additional funding" in order to raise capital through equity financing involved the bribery scheme and manipulative conduct complained of herein, not a legitimate business endeavor; and,

(c)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received.

79.     Furthermore, under the heading "Operating Expenses," the Company's Form 10-Qs and Form 10-Ks (specifically, Q1:05 10-Q; Q2:05 10-Q; Q3:05 10-Q; 2004 10-K, Q1:06 10-Q; Q2:06 10-Q; Q3:06 10-Q; 2005 10-K, Q1:07 10-Q; Q2:07 10-Q; 2006 10-K, and 2007 10-K) note:

General and Administrative.  General and administrative expenses consist of salaries and related expenses for executive, finance and accounting,

human resources, and management information systems personnel, professional fees, and other corporate expenses, including facilities costs. We expect that in the future, general and administrative expenses will increase as we add administrative and finance personnel and incur additional professional fees and insurance costs related to the growth of our business and to our operations as a public company.

80.     Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew or were severely reckless in not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)     Smart Online Defendants failed to disclose that General and Administrative expenses either factored in the bribes paid to brokers or excluded such bribes from the financial statements;

(c)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe

38

Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(d)     Smart Online Defendants failed to disclose that there was inadequate legal and accounting review of material contracts, including consulting and investor relations agreements; and,

(e)     **Smart Online Defendants failed to disclose that the Company** suffered from internal and financial control deficiencies.

81.     In discussing the Company's "Critical Accounting Policies and Estimates," the Company's Form 10-Qs and Form 10-Ks (specifically, Q1:05 10-Q; Q2:05 10-Q; Q3:05 10-Q; 2004 10-K, Q1:06 10-Q; Q2:06 10-Q; Q3:06 10-Q; 2005 10-K; Q1:07 10-Q; Q2:07 10-Q; and, 2006 10-K) note:

> Our discussion and analysis of financial condition and results of operations are based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosures of contingent assets and liabilities. "Critical accounting policies and estimates" are defined as those most important to the financial statement presentation and that require the most difficult, subjective, or complex judgments. We base our estimates on historical experience and on various other factors that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Under different assumptions and/or conditions, actual results of operations may materially differ. [Emphases added.]

82.     Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading.  Smart Online Defendants removed the above statements from the Q3:07 10-Q and 2007 10-K, the Company's first Form 10-Q issued after the September arrests of defendants Michael Nouri, Eric Nouri, Serrano, Martin, Doolan, and Lustig.  Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)     Smart Online Defendants failed to disclose that management's plans "to raise capital and generate greater cash flows" stemmed from the bribery scheme and manipulative conduct, not from some legitimate business endeavors;

(c)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, the Smart Online Defendants failed to disclose, among other things, which should have factored into the Company's "critical accounting policies and estimates": (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online

stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(d)     Smart Online Defendants failed to disclose that there was inadequate legal and accounting review of material contracts, including consulting and investor relations agreements;

(e)     Smart Online Defendants failed to disclose that the Company suffered from internal and financial control deficiencies;

(f)     Smart Online Defendants failed to disclose that there was inadequate legal and accounting review of material contracts, including consulting and investor relations agreements, and so had the inability to issue critical estimates or issue statements about what was a critical accounting policy;

(g)     Defendant Michael Nouri failed to set and follow proper corporate governance and compliance requirements as Smart Online moved from being a private company to being a public company; and

(h)     The Smart Online Defendants failed to disclose that the Company suffered from internal and financial control deficiencies.

83.     The Company's Q2:05 10-Q reported:

[A]n increase [in general and administrative expenses in the second quarter of 2005 from the second quarter of 2004] of approximately

$113,000 in consulting expenses, an increase of approximately $53,000 in travel related expenses, and an increase in expenses associated with the Sarbanes-Oxley Act. These increases were offset in part by a decrease of approximately $71,000 in legal and professional fees. The increase in consulting fees is attributable to approximately $68,000 of expense associated with the issuance of stock options to a strategic consultant and fees to various consultants engaged by the company to assist with public relations, investor relations, financing, and strategic planning. The increase in travel related expenses is primarily related to an increase in travel associated with investor relations and presentations to investor prospects. [Emphasis added.]

\*       \*       \*

[A]n increase [in general and administrative expenses in the second half of 2005 from the first half of 2004] of approximately $70,000 in consulting expenses, an increase of approximately $53,000 in travel related expenses, and an increase of approximately $153,000 in accounting and consulting  fees associated with complying with public company reporting requirements and the Sarbanes-Oxley Act. The increase in consulting fees is attributable to approximately $68,000 if expense associated with the issuance of stock options to a strategic consultant and fees to various consultants engaged by the company to assist with public relations, investor relations, financing, and strategic planning. The increase in travel related expenses is primarily related to an increase in travel associated with investor relations and presentations to investor prospects. These increases were offset in part by a $45,000 decrease in legal and professional fees. [Emphasis added.]

84.     The Company's Q3:05 10-Q also reported:

Operating expenses [which include general and administrative expenses] increased from $1,254,341 during the third quarter of 2004 to $2,507,354 for the third quarter of 2005. As discussed below, the principal factors resulting in the increase in operating expense were (1) an increase of approximately $437,074 of consulting expenses, (2) an increase of approximately $40,286 in travel related expenses, (3) the inclusion of $539,051 of expenses associated with investors relations activities[.] [Emphasis added.]

\*       \*       \*

42

Operating expenses increased from $2,866,500 during the first nine months of 2004 to $4,834,860 for the first nine months of 2005. As discussed below, the principal factors resulting in the increase in operating expense were (1) an increase of approximately $507,009 of consulting expenses associated with certain Investor Relations consulting agreements, an increase of approximately $76,643 in travel related expenses, the inclusion of $713,000 expense associated with marking a consultants warrants to market, and an inclusion $556,047 of expenses associated with allocating Investment Relations expenses[.] [Emphasis added.]

85. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a) Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b) Smart Online Defendants failed to disclose that General and Administrative, as well as Operating, expenses either factored in the bribes paid to brokers or excluded such bribes from the financial statements;

(c) Smart Online Defendants failed to disclose that consulting and investor relation expenses were masks for the bribes paid to the Broker Defendants and Doe Defendants;

43

(d)     Despite their fiduciary, statutory and other duties owed to shareholders and investors,  Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(e)     Smart Online Defendants failed to disclose that the Company suffered from inadequate diligence by management and the Board of Directors regarding third parties with which the Company contracted, including outside investor relations vendors, some of which were registered brokers;

(f)     The travel related expenses noted above were for the express purpose of travel costs to meet with the bribed brokers; and,

(g)     Smart Online Defendants never disclosed that the reason they had an "offset" of legal and professional fees was so they could reallocate funds to bribe brokers and/or knowingly or severely disregard the securities laws.

86.     The Company disclosed in the Q1:05 10-Q, Q2:05 10-Q, and Q3:05 10-Q that the "auditors have issued an explanatory paragraph" in the Company's Form 10-K for the year ended December 31, 2004, "in which they express substantial doubt as to our

44

ability to continue as a going concern." But, as noted in the Q1:05 10-Q, Q2:05 10-Q, and Q3:05 10-Q,

> Smart Online's continuation as a going concern is dependent upon its ability to generate sufficient cash flows to meets [sic] its obligations on a timely basis, to obtain additional financing as may be required and ultimately to attain profitable operations and positive cash flows. As is discussed below, management has plans which it believes will enable Smart Online to raise capital and generate greater cash flows from operations. However, there can be no assurance that these efforts will be successful. If our efforts are unsuccessful, we may have to cease operations and liquidate our business. [Emphases added.]

87. The Q1:05 10-Q, Q2:05 10-Q, and Q3:05 10-Q further stated that "additional financing to fund our operations or growth" will be required in the future. "We cannot assure you that such funding will be available [and if] sufficient capital is not raised, our ability to achieve or sustain positive cash flows, maintain current operations, fund any potential growth, take advantage of unanticipated opportunities, develop or enhance services or products, or otherwise respond to competitive pressures would be severely limited." [Emphasis added.]

88. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. The above statements were removed beginning with the Q1:06 10-Q, which was the Company's first quarterly filing after the January 2006 SEC suspension, and consequently not found in the Q2:06 10-Q, Q3:06 10-Q, Q1:07 10-Q, Q2:07 10-Q, and Q3:07 10-Q. Smart Online Defendants knew and/or

45

were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)     Smart Online Defendants failed to disclose that management's plans "to raise capital and generate greater cash flows" involved the bribery scheme and manipulative conduct complained of herein, not a legitimate business endeavor;

(c)     Smart Online Defendants failed to disclose that the Company's response to "competitive pressures" was a scheme to manipulate the market for SOI stock and bribe brokers; and,

(d)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received.

89.     Under the heading, "Evaluation of Disclosure Controls and Procedures,"

the Q1:05 10-Q, Q2:05 10-Q, Q3:05 10-Q, and 2004 10-K notes:

> Our Board of Directors approved disclosure controls and procedures
> ("Disclosure Controls") based on the evaluation and recommendations of
> our Chief Executive Officer and Chief Financial Officer in connection with
> preparation of financial statements for the period covered by this Form 10-
> Q.  Disclosure Controls are controls and procedures designed to
> reasonably assure that information required to be disclosed in our reports
> filed under the Exchange Act, such as this Form 10-Q, is recorded,
> processed, summarized and reported within the time periods specified in
> the U.S. Securities and Exchange Commission's (SEC's) rules and forms.
> Disclosure Controls are also designed to reasonably assure that such
> information is accumulated and communicated to our management,
> including the CEO and CFO, as appropriate to allow timely decisions
> regarding required disclosure.  [Emphasis added.]

90.     Each of the above statements, made and/or approved by Smart Online

Defendants, was materially false and misleading when made and omitted to reveal

material information necessary to make the statements, in light of such material

omissions, not materially false and misleading.  The above statement was removed

beginning with the Q1:06 10-Q, which was the Company's first quarterly filing after the

January 2006 SEC suspension, and consequently not found in the Q2:06 10-Q, Q3:06 10-

Q, Q1:07 10-Q, Q2:07 10-Q, Q3:07 10-Q, 2005 10-K, and 2006 10-K.  Smart Online

Defendants knew and/or were severely reckless in disregarding or not knowing that the

above statements were materially false and misleading or omitted to reveal material

information, due, among other things, to the following:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)     Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(c)     Smart Online Defendants failed to disclose that the Company suffered from inadequate diligence by management and the Board of Directors regarding third parties with which the Company contracted, including outside investor relations vendors, some of which were registered brokers;

(d)     Smart Online Defendants failed to disclose that management and the Company's directors lacked sufficient knowledge regarding rules and regulations with respect to dealings between registered brokers and public companies;

(e)     Smart Online Defendants failed to disclose that there was inadequate legal and accounting review of material contracts, including consulting and investor relations agreements;

(f)     Smart Online Defendants failed to disclose that there was inadequate training and understanding of SEC disclosure requirements;

(g)     Smart Online Defendants failed to disclose that there was a failure to communicate and to stress the importance of controls and procedures throughout the Company;

(h)     Smart Online Defendant Michael Nouri failed to set and follow proper corporate governance and compliance requirements as Smart Online moved from being a private company to being a public company; and,

(i)     Smart Online Defendants failed to disclose that the Company suffered from internal and financial control deficiencies.

91.     Defendants Michael Nouri, Whitaker, and Sinigaglia issued SOX Certifications as part of the Company's Form 10-Q and Form 10-K filings (including the Q1:05 10-Q, Q2:05 10-Q, Q3:05 10-Q, Q1:06 10-Q, Q2:06 10-Q, Q3:06 10-Q, Q1:07 10-Q, Q2:07 10-Q, Q3:07 10-Q, 2004 10-K, 2005 10-K, 2006 10-K, and 2007 10-K) attesting to the following:

(1)     I have reviewed this quarterly report on Form 10-Q [or the annual report on Form 10-K] for the [year or] quarter [] of Smart Online, Inc.;

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

49

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report [Emphasis added];

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared [Emphasis added];

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation [Emphasis added]; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting. [Emphasis added.]

92. As Michael Nouri, Whitaker, and Sinigaglia further certified as part of the Form 10-Q filings (including the Q1:05 10-Q, Q2:05 10-Q, Q3:05 10-Q, Q1:06 10-Q, Q2:06 10-Q, Q3:06 10-Q, Q1:07 10-Q, Q2:07 10-Q, and Q3:07 10-Q):

The undersigned [] certifies...that [] The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [] The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

93. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a) Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b) Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among

other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendant, Doe Defendants and the Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(c)     Smart Online Defendants failed to disclose that the Company suffered from inadequate diligence by management and the Board of Directors regarding third parties with which the Company contracted, including outside investor relations vendors, some of which were registered brokers;

(d)     Smart Online Defendants failed to disclose that management and the Company's directors lacked sufficient knowledge regarding rules and regulations with respect to dealings between registered brokers and public companies;

(e)     Smart Online Defendants failed to disclose that there was inadequate legal and accounting review of material contracts, including consulting and investor relations agreements;

(f)     Smart Online Defendants failed to disclose that there was inadequate training and understanding of SEC disclosure requirements;

52

(g)     Smart Online Defendants failed to disclose that there was a failure to communicate and to stress the importance of controls and procedures throughout the Company;

(h)     Smart Online Defendant Michael Nouri failed to set and follow proper corporate governance and compliance requirements as Smart Online moved from being a private company to being a public company; and,

(i)     Smart Online Defendants failed to disclose that the Company suffered from internal and financial control deficiencies.

## THE TRUTH SLOWLY BEGINS TO EMERGE

94.     On January 17, 2006, the SEC  suspended trading of SOI stock and NASDAQ withdrew its acceptance of SOI's application.  SOI stock never traded on the NASDAQ.  Further, the SEC notified brokers and dealers that they were prohibited from directly or indirectly offering quotations on SOI stock unless they strictly complied with Rules 15c2-11.

95.     SOI stock closed at $10.00 per share on January 13, 2007 (the last trading day before the SEC suspension) and remained at this level during the period of suspension.  Trading of SOI stock resumed on February 6, 2006, when the stock opened at $9.25 per share, reaching an inter-day low of $3.00 per share, before closing up at $9.00 per share.  The following day, the per share price plummeted dramatically to close at $3.25 per share.

96.    On January 17, 2006, SOI issued a press release announcing the SEC suspension.  It filed a Form 8-K with the SEC, which reiterated the SEC's conclusion there was possible manipulative conduct occurring in the market for the Company's stock.   This release never stated that defendants were directly involved in the manipulative conduct that led to the SEC suspension.

<u>DIRECTORIAL-LEVEL AND AUDITOR DEPARTURES</u>

97.    On March 25, 2006, The News and Observer (Raleigh, North Carolina) reported on high-level changes at the Company with the headline, "Trouble Dogs Smart Online; Auditor Resigns from Durham Software Seller, which also Lost a Director this Month":

> Smart Online has spent the past 13 years selling software that helps small businesses grow.
>
> Now it seems the Durham company needs some help of its own.
>
> On Thursday, Smart Online reported to the Securities and Exchange Commission and investors that its auditor had resigned after four months.  Earlier this month, it said a director had left the company's board, too.  And on Jan. 26, the company announced that financial services giant Capital One Services would end its contract with Smart Online two months earlier than planned.  [Emphasis added.]
>
> That's on top of a 10-day trading suspension in January that scuttled Smart Online's planned stock listing on the Nasdaq Capital Market.  Smart Online said this week that its audit committee has hired lawyers to conduct an internal investigation of the suspension.
>
> Smart Online's shares, which don't trade on an organized exchange, have fallen as the bad news piled up.  The stock dropped from $10 on Jan. 13, the last day before the trading suspension, to $2 on Wednesday, the last day it traded.

54

The string of announcements and plummeting stock price signal trouble for the company, which has about 70 employees across the country, half at its headquarters in Durham. As early as last winter, Smart Online's accountants were questioning its viability as an ongoing business.

"It sounds like there's a lot of uncertainty," Robert Bushman, an accounting professor at UNC-CH's Kenan-Flagler School of Business, said. "They're losing some customers, and maybe the director wants to spend some time with his family and maybe there was no overt disagreement between the accountants and the firm, but when you see those things happening together, it increases your concern."

Smart Online said in SEC filings that neither the director nor the accounting firm left because of disagreements with the company. [Emphasis added.]

Tom Furr, the company's chief operating officer, declined to comment for this article.

98.     Defendant Sarna, a Director of the Company during the Class Period, resigned from that position, effective June 23, 2006, just two weeks before the Company issued a brief summary of the findings of the Audit Committee supposed investigation of the SEC's suspension of trading in SOI shares.   Defendant Coll, a Director of the Company during the Class Period, beginning in April 2005, resigned his position as a Director on March 5, 2006 during the height of the Audit Committee investigation of the SEC's suspension of trading in SOI shares.  Neither defendants Sarna nor Coll explained their sudden departures from the Company nor did either defendant Sarna nor Coll disclose that:

(a)     Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose the full truth in that they participated directly in the bribery

55

scheme and in the manipulative conduct complained of herein and, as a result, Michael Nouri was not "focused on and committed to improving the corporate governance and compliance practices throughout the Company."

(b)    Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received; and,

(c)    The Audit Committee consisted of defendants Michael Nouri, Furr, and LeRose (the Chairman of the Audit Committee), who were each self-interested in the outcome of the sham investigation, directly involved in the bribery scheme and sought to cover-up their own involvement in the manipulative scheme.

<u>FALSE AUDIT COMMITTEE CONCLUSIONS</u>

99.    A press release issued on July 7, 2006 by the Company noted that "[o]f the twelve months ended December 31, 2005 [the reported net loss attributable to common shareholders of] $9,737,500 was a non-cash charge related to common shares issued for

certain investor relations services." The release further quoted Michael Nouri as stating:

"The Company and I are focused on and committed to improving the corporate governance and compliance practices throughout the Company."

100.    The July 7, 2006 press release also noted:

In March 2006, our Board of Directors authorized its Audit Committee to conduct an internal investigation of matters relating to the SEC matter. The Audit Committee retained independent outside legal counsel to assist in conducting the investigation. On July 7, 2006, the independent outside legal counsel shared final findings with the Audit Committee, which were then shared with the full Board of Directors. The Audit Committee has not concluded that any of our officers or directors have engaged in fraudulent or criminal activity. However, it did conclude that we lacked an adequate control environment, and will take action to address certain conduct of management that was revealed as a result of the investigation. As one of the results of these findings, Mr. Jeffrey LeRose was appointed to the position of non-executive Chairman of the Board of Directors to separate the leadership of the Board of Directors from the management of the Company, which is a recommended best practice for solid corporate governance. Mr. Nouri has stepped down as Chairman of the Board of Directors, but will continue to serve as our President, Chief Executive Officer and as a member of the Board of Directors. [Emphasis added.]

In commenting on the final findings, Mr. Nouri stated, "I would like to thank Mr. LeRose for accepting this additional responsibility, which will take more time and effort on his behalf. The Company and I are focused on and committed to improving the corporate governance and compliance practices throughout the Company." [Emphasis added.]

Mr. LeRose added, "In order to achieve Smart Online's significant potential, we will be implementing additional changes to our controls and procedures to address the issues raised during the investigation. This, in combination with previously planned actions, will assist the Company in complying with Section 404 of the Sarbanes-Oxley Act, which compliance is required by non-accelerated filers, such as Smart Online, by the end of 2007."

57

101. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a) Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose the full truth in that they participated directly in the bribery scheme and in the manipulative conduct complained of herein and, as a result, Michael Nouri was not "focused on and committed to improving the corporate governance and compliance practices throughout the Company."

(b) Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received; and,

(c)     The Audit Committee consisted of defendants Michael Nouri, Furr, and LeRose (the Chairman of the Audit Committee), who were each self-interested in the outcome of the sham investigation, directly involved in the bribery scheme and sought to cover-up their own involvement in the manipulative scheme.

102.   SOI shares opened at $2.25 on July 10, 2006, the first trading day after the release was issued, but closed at $1.50 per share, a drop of approximately 33%, on heavy volume of 22,100 traded shares.

103.   In its 2005 10-K, filed with the SEC on July 11, 2006, SOI discussed the Audit Committee's conclusions, but, added one sentence conspicuously absent from the July 7, 2006 press release:

> In March 2006, our Board of Directors authorized its Audit Committee to conduct an internal investigation of matters relating to the SEC suspension and investigation. The Audit Committee retained independent outside legal counsel to assist in conducting the investigation. On July 7, 2006, the independent outside legal counsel shared final findings with the Audit Committee, which were then shared with the full Board of Directors. The Audit Committee did not conclude that any of our officers or directors have engaged in fraudulent or criminal activity. However, it did conclude that we lacked an adequate control environment, and has taken action to address certain conduct of management that was revealed as a result of the investigation. The Audit Committee concluded that the control deficiencies primarily resulted from our transition from a private company to a publicly reporting company and insufficient preparation for, focus on and experience with compliance requirements for a publicly reporting company. As one of the results of these findings, Mr. Jeffrey LeRose was appointed to the position of nonexecutive Chairman of the Board of Directors to separate the leadership of the Board of Directors from the management of the Company, which is a recommended best practice for solid corporate governance. Mr. Nouri has stepped down as Chairman of the Board of Directors, but will continue to serve as our president, chief

executive officer and as a member of the Board of Directors. [Emphasis added.]

104. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)    Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose the full truth in that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)    Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received; and,

(c)     The Audit Committee consisted of defendants Michael Nouri, Furr, and LeRose (the Chairman of the Audit Committee), who were each self-interested in the outcome of the sham investigation and they sought to cover-up their own involvement in the manipulative scheme.

105.     The 2005 10-K revealed the more specific conclusions of the Audit Committee:

> The Audit Committee concluded that: (i) our Chief Executive Officer should have disclosed and sought approval from the Board of Directors before entering into certain transactions and arrangements, including personal loans; (ii) there was inadequate diligence by management and the Board of Directors regarding third parties with which we contracted, including outside investor relations vendors, some of which were registered brokers; (iii) management and our directors lacked sufficient knowledge regarding rules and regulations with respect to dealings between registered brokers and public companies;  (iv) we lack clear policies regarding the limits on the Chief Executive Officer's authority to enter into business transactions and agreements without Board approval; (v) there has been inadequate legal and accounting review of material contracts; (vi) there has been inadequate training and understanding of SEC disclosure requirements; (vii) there was an unintentional violation of our Securities Trading Policy by one of our directors as previously reported in our public filings; (viii) we have inadequate processes for determination of independence of Board members; and (ix) there has been a failure to communicate and stress the importance of controls and procedures throughout our organization.  [Emphasis added.]
>
>                              *       *       *
>
> The Audit Committee also has been critical of Mr. Nouri in that he failed to set and follow proper corporate governance and compliance requirements as Smart Online moved from being a private company to being a public company; required Mr. Nouri to repay all amounts outstanding to Berkley Financial Services by December 31, 2006 (for a description of Mr. Nouri's loan arrangement with Berkley see Item 13 of this report); required that the Chief Financial Officer, at a minimum, be involved in all communications with investment professionals, including analysts, brokers and potential

institutional investors; and provided the Chief Financial Officer with direct reporting responsibility to the Audit Committee with respect to any such communications. In addition, the Audit Committee has required significant strengthening to our system of disclosure controls and procedures to ensure that all material facts and developments relating to our business and operations are timely and accurately disclosed. [Emphasis added.]

106. Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a) Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose the full truth in that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b) Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker

Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received; and,

(c)     The Audit Committee consisted of defendants Michael Nouri, Furr, and LeRose (the Chairman of the Audit Committee), who were each self-interested in the outcome of the sham investigation and they sought to cover-up their own involvement in the manipulative scheme.

107.    Under the heading "Investor Relations Expenses" in the 2005 10-K, the Company stated that it had entered into agreements for investor relations services with certain stockholders, including Ruben Serrano. The Company reported paying Serrano $23,200 in cash and 2,000 shares of stock for his services. In addition, the Form 10-K revealed the following with respect to the activities of "investor relations consultants":

> In addition, it appears that some of the persons that were hired by us as investor relations consultants during 2005 may have engaged in trading of our Common Stock. Based on our review of certain stockholder lists, it appears five of these persons purchased and/or sold shares of our common stock on the open market between late August and mid-December of 2005. Based on these reports, the total number of shares acquired by these persons was approximately 20,000 shares. According to these same reports, the total number of shares disposed of by these persons was approximately 14,500 shares. We are not aware of the prices paid or received by these persons in these trades. Because it is possible to trade in our securities through accounts under different names, we are not able to verify whether the foregoing constitutes all of the trading in our securities by our investor relations consultants.

108.    Each of the above statements, made and/or approved by Smart Online Defendants, was materially false and misleading when made and omitted to reveal material information necessary to make the statements, in light of such material

omissions, not materially false and misleading. Smart Online Defendants knew and/or were severely reckless in disregarding or not knowing that the above statements were materially false and misleading or omitted to reveal material information, due, among other things, to the following:

(a)    Smart Online Defendants (including Michael Nouri and Eric Nouri) failed to disclose the full truth in that they participated directly in the bribery scheme and in the manipulative conduct complained of herein;

(b)    Despite their fiduciary, statutory and other duties owed to shareholders and investors, Smart Online Defendants failed to disclose, among other things: (i) that Smart Online Defendants paid bribes to the Broker Defendants and Doe Defendants to recommend the purchase of Smart Online stock by means of secret bribes; (ii) that Smart Online Defendants, Doe Defendants and Broker Defendants covered-up the bribes as consulting or investor relation fees, unbeknownst to shareholders; (iii) that each of the Broker Defendants and Doe Defendants received bribes; and, (iv) the amount of the bribes that were paid or received;

(c)    Smart Online Defendants failed to disclose if the contract with Serrano had been terminated or that it was nothing more than a sham consulting agreement. Clearly, as of the time that the 2005 10-K was issued, SOI had conducted a thorough review of its consulting agreements and, nonetheless, failed to disclose that Serrano's contract was a sham consulting agreement. Likewise,

64

Case 1:07-cv-00785-WO -PTS   Document 32   Filed 09/08/08   Page 64 of 112

SOI chose not to take action against Serrano for a refund of the bribe monies which he had been paid;

(d)    Smart Online Defendants failed to disclose that the investor relations entries on the books masked the bribes paid to the Broker Defendants and Doe Defendants; and,

(e)    Smart Online Defendants failed to disclose the full truth about the inadequate legal and accounting review of material contracts, including consulting and investor relations agreements.

109.    In addition, the 2005 10-K noted personnel changes, including:

[I]n March 2006, we hired a new Chief Financial Officer with experience auditing public companies as a certified public accountant, and we retained our former Chief Financial Officer as Controller.

*       *       *

Since the commencement of the SEC action and the related Audit Committee investigation, two of our independent Board members [David E.Y. Sarna ("Sarna") and Frank Coll ("Coll")] have resigned due to the time commitments required to adequately perform their Board duties. One of these Board members was our Audit Committee's chairman and our audit committee financial expert. [Emphases added.]

110.    The 2005 10-K also revealed that the Company's General Counsel and Secretary, Joan A. Keston ("Keston"), had left the Company. "She was responsible for negotiating partnerships and acquisitions strategic to the on-going development our applications [sic] for small-to-medium size businesses [], as well as handling our the [sic] legal affairs in general." Keston had entered into an employment agreement with "a termination date of June 30, 2006" and which provided a $50,000 increase in salary (from

65

a beginning salary of $100,000) over a four-month period beginning on June 1, 2005. Effective June 1, 2006, Keston was no longer employed by the Company.

111.    The July 7, 2006 press release and 2005 10-K, however, constituted only a partial disclosure of the full truth.  Investors only began to recognize that the Company's prior disclosures were misstatements or omissions of material fact relative to the Company's operations, controls, business and accounting practices, and scope of the manipulative conduct were false.  The full truth about the involvement of defendants in the manipulative conduct only emerged after the arrests of defendants Michael Nouri, Eric Nouri, Serrano, Lustig, Doolan, and Martin, and only once the Company entered into the consent judgment in the SEC Civil Action.

112.    On September 11, 2006, SOI's stock resumed trading on the OTC Bulletin Board.  In a press release issued by SOI on the same date, defendant Michael Nouri stated:

> We are very pleased to again be listed on the Bulletin Board and would like to thank our shareholders for their support through the last few quarters. We believe this step is an important accomplishment in light of the Securities and Exchange Commission's suspension of our trading in January 2006 and our Audit Committee's independent investigation.  As we continue to focus on improving our controls and procedures and on building the leading on-demand small business applications to build a strong company, I also would like to commend our employees whose energy and dedication have been an essential part of bringing us to this point.

Notwithstanding this statement, the Smart Online Defendants were aware or severely reckless in not taking all necessary steps to inform the investing public of all material and relevant facts, and, indeed, had withheld relevant  facts from the investing public,

including full and complete details of the manipulative conduct and the personal and direct involvement of Michael Nouri and Eric Nouri.

113.   On October 3, 2006, the Company issued a release, stating:

Smart Online Selects Ethical Advocate for Section 301 Sarbanes-Oxley Reporting Compliance

Smart Online (OTCBB: SOLN), a leading provider of Software-as-a-Service (SaaS) for the small business market, today announced that it had engaged Ethical Advocate, a leading provider of anonymous and confidential online incident reporting solutions to comply with the complaint reporting provisions of Section 301 of the Sarbanes-Oxley Act of 2002. The Ethical Advocate product will be an integral part of Smart Onlines improvement of its internal control program. The product is designed to insure transparency and compliance with Sarbanes-Oxley. According to Michael Nouri, CEO and President of Smart Online, Inc. We are pleased to announce another step to insure our employees, shareholders, and the investment community of our commitment to proper corporate governance. We pride ourselves on maintaining a work environment that not only allows, but encourages our employees to report questionable matters safely and anonymously. It is clear that Smart Online values the input of its stakeholders and is working to build robust ethics programs, said Ethical Advocates president, Jacob Blass.  [Emphasis added.]

Notwithstanding this statement, the Smart Online Defendants were aware or severely reckless in not taking all necessary steps to inform the investing public of material and relevant facts, and, indeed, had withheld relevant facts from the investing public, including full and complete details of the manipulative conduct and the personal and direct involvement of Michael Nouri and Eric Nouri.

114.   On March 30, 2007, the Company issued a news release, in which defendant Michael Nouri is quoted as follows:

"During 2006 we faced tremendous difficulties, but with the addition of our Smart Commerce operations we were successful in building our subscription revenue. I am pleased to report that for the first time as a publicly traded company, Smart Online received an unqualified audit opinion. We believe this is a significant sign of the improved financial position of the company," said Michael Nouri, chief executive officer and president of Smart Online. [Emphasis added.]

Notwithstanding this statement, the Smart Online Defendants were aware or severely reckless in not taking all necessary steps to inform the investing public of material and relevant facts, and, indeed, had withheld relevant facts from the investing public, including full and complete details of the manipulative conduct and the personal and direct involvement of Michael Nouri and Eric Nouri.

## THE FULL TRUTH IS FINALLY REVEALED

115.    On September 11, 2007, the full truth began to be finally revealed. Defendants Michael Nouri, Eric  Nouri, Serrano, Lustig, Doolan, and Martin  were arrested and charged with federal securities fraud and conspiracy to commit securities fraud.  The Company immediately issued a press release regarding the criminal charges, which reiterated the steps taken in response to the 2006 Audit Committee investigation and announced that Defendant Nouri had resigned his employment.   Thereafter, SOI terminated the employment of defendants Eric Nouri and Henry Nouri.

## ARRESTS AND GOVERNMENT ACTIONS

116.    Also on September 11, 2007, after obtaining investigative assistance from the Federal Bureau of Investigation, the SEC filed an injunctive complaint in the Southern District of New York.  The SEC Civil Action named the following as

defendants: Smart Online, Michael Nouri, Eric Nouri, Martin, Doolan, Serrano, and Lustig. Each was charged with violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5 in connection with the payments of bribes to Martin, Doolan, Serrano, and Lustig, among others.

117. News of the arrests sent shock waves to the investing community, as evidenced by the seismic drop of SOI's per share price in a single trading day. Smart Online stock opened at $2.55 that morning and closed to a paltry $.68, on heavy trading volume of 139,000 shares.

118. On the day of the arrests, The Triangle Business Journal reported:

Smart Online CEO arrested on charges of securities fraud

The chief executive of Smart Online, his brother, and four brokers have been arrested on charges of securities fraud.

CEO Dennis Michael Nouri and his brother, Smart Online employee Reeza Eric Nouri, are accused of paying bribes to brokers over several months in 2005. The brokers, in turn, asked customers to buy the Durham company's stock and drive up its price, the U.S. Attorney's Office in Manhattan said Tuesday.

The arrested brokers are Ruben Serrano, Anthony Martin, James Doolan and Alain Lustig, all based out of New York.

Attempts to reach Smart Online representatives were unsuccessful.

Smart Online shares debuted at $1.50 on the Over-the-Counter Bulletin Board in 2005 after investors demanded a way to cash out of their shares. The federal indictment states that the Nouris wanted to boost that price and get shares of the company to debut on the Nasdaq Stock Market.

The U.S. Securities and Exchange Commission caught on, suspending trading of the stock in January 2006 after citing a lack of reliable financial information and the possible manipulation of the company's stock price. On

Jan. 13, 2006 - the last trading day before the suspension - Smart Online shares closed at $10, up more than six-fold from their debut just months earlier.

After the SEC suspended trading in the stock, the indictment states, federal investigators taped conversations in which Michael Nouri talked to a witness about how to lie to investigators and how to be careful when paying kickbacks to brokers. [Emphasis added.]

The Nouris also are accused of lying about and omitting material business facts in Smart Online's securities reports. All six defendants have been charged with one count of conspiracy and one count of securities fraud, according to the U.S. Attorney's office.

Shares of Smart Online (OTCBB: SOLN) lost 79 percent of their value in trading Tuesday, changing hands at 60 cents in mid-afternoon trading. [Emphasis added.]

119.    An article by The News & Observer on September 12, 2007 reports:

Six charged in Smart Online plot; The former CEO, his brother and four brokers tried to manipulate the price of the technology company's stock, federal prosecutors say.

News of the arrests comes after several warning signs last year. In January 2006, the Securities and Exchange Commission suspended trading in Smart Online's stock on suspicion of stock manipulation. The move derailed the company's plans to list its stock on the Nasdaq Capital Market.

The company conducted an internal investigation but did not conclude that officers or directors had engaged in criminal or fraudulent activity, Smart Online wrote in a filing with the SEC. Smart Online installed a new chairman in a bid to improve transparency and strengthen its corporate governance.

The costs of the investigations hurt the company's profit and stock price, which had climbed above $11 in 2005 but fell to $2 in March 2006.

On Tuesday, Smart Online's shares, which trade on the over-the-counter market, lost three-quarters of their value, falling $2.12 to 68 cents.

The alleged scheme revolved around trying to boost Smart Online's stock

price before a planned public listing on the Nasdaq, U.S. Attorney Michael J. Garcia said in a prepared statement. The conspiracy took place from May 2005 to July 2007, according to the complaint filed in federal court in Manhattan. At the time, Michael Nouri owned thousands of shares, the complaint alleges.

Garcia's office said it has recorded conversations in which Michael Nouri told conspirators, including an unnamed witness, to lie to investigators to cover up the alleged scheme and broker kickbacks. [Emphasis added.]

The complaint alleges that Michael Nouri instructed conspirators to tell investigators they "had not done anything wrong" and "did not pump and dump the stock." Michael Nouri also warned them against being photographed and demonstrated how to transfer money to another person without being seen, the complaint said. [Emphasis added.]

The New York brokers -- Ruben Serrano, Anthony Martin, James Doolan and Alain Lustig -- were arrested Tuesday on securities fraud and conspiracy charges.

Michael Nouri arranged to pay the brokers and the unnamed witness at least $136,000 in bribes to sell more Smart Online shares to investors and drive up the stock price, according to the complaint. The SEC also brought civil charges against the six.

120. On November 8, 2007, the United States Attorney for the Southern District of New York filed grand jury criminal Indictments against defendants Michael Nouri, Eric Nouri, Serrano, and Lustig, and an Information against defendants Martin and Doolan. The Federal Criminal Action Charging Papers leveled charges against each of the foregoing defendants for conspiracy to commit securities fraud, securities fraud, wire fraud, and commercial bribery. The Indictments, for example, charged, inter alia, the following:

Pay[ing] secret bribes, or 'kickbacks,' to [a confidential witness who was a registered representative of the Manhattan branch of a brokerage firm], and others known and unknown, in order to induce SERRANO, LUSTIG, [two

71

co-conspirators], and others known and unknown, to sell Smart Online stock to their customers....

SERRANO, LUSTIG, [two co-conspirators], and others known and unknown, did not disclose to their customers, notwithstanding their respective fiduciary duties to do so, the facts that: [] they had been induced to recommend Smart Online stock by means of secret bribes [and] they had in fact received such bribes. In addition, the statements that SERRANO, LUSTIG, [co-conspirators], and others made to their customers about Smart Online were materially misleading in light of the omitted information described above.

121.    The Information to which defendant Doolan pled guilty charged, inter alia,

the following:

From in or about May 2005 through in or about July 2007, JAMES DOOLAN, the defendant, and others known and unknown, participated in a fraudulent scheme to manipulate artificially the market price and demand for Smart Online stock and to defraud the purchasers of Smart Online stock. In order to generate an artificial demand for Smart Online stock, DOOLAN, and others known and unknown, were paid secret bribes, or "kickbacks," by the former Chief Executive Officer of Smart Online, and others known and unknown, in order to induce DOOLAN and others to sell Smart Online stock to their brokerage customers.

*       *       *

In soliciting purchases of Smart Online stock, JAMES DOOLAN, the defendant, and others known and unknown, did not disclose to their customers, notwithstanding their respective fiduciary duties to do so, the fact that: (1) they had been induced to recommend Smart Online stock by means of secret bribes; or (2) they had in fact received such bribes. In addition, the statements that DOOLAN and others made to their customers about Smart Online were materially misleading in light of the omitted information described above.

72

## DEFENDANT MICHAEL NOURI IS RECORDED
## DESCRIBING HOW TO LIE TO GOVERNMENT INVESTIGATORS

122.    On the day of the filing of the Indictments, a press release issued by the

United States Attorney described part of the conspiratorial scheme:

> In several recorded conversations and telephone calls, DENNIS MICHAEL
> NOURI and REEZA ERIC NOURI discussed the details of the fraudulent
> scheme, including the amount of the kickbacks paid to brokers for buying
> Smart Online stock and the NOURIS' desire to pump up the price of the
> stock before the company was listed on the NASDAQ Capital Market.
>
> In conversations recorded after the Securities and Exchange Commission
> ("SEC") suspended trading of Smart Online stock on the NASDAQ,
> DENNIS MICHAEL NOURI described how to lie to investigators to
> cover up the scheme and how to be careful when paying kickbacks to
> brokers.  He warned that someone might be taking pictures and
> demonstrated how to transfer money to another person without being
> seen.  In another meeting, NOURI took a cooperating broker's cell phone
> to delete a phone number the broker had been using to contact him, and
> gave the broker a number to call when speaking with him in the future.
> [Emphasis added.]
>
> *       *       *
>
> [United States Attorney Michael Garcia] praised the efforts of the FBI and
> the SEC in the investigation of this case.

123.    On September 28, 2007, the last day of the Class Period, SOI consented to

entry of a Final Judgment in the SEC lawsuit and announced the same to the public in a

press release.  This Final Judgment represents to investors for all intents and purposes the

functional equivalent of a concession as to the allegations contained in the SEC

Complaint and marks the culmination of the trying period through which defendants,

including Michael Nouri, subjected the Company.  Stock prices opened on September 28,

2007 at $1.50 per share, and closed at $1.87 per share. The stock price saw an increase over the next two days to close on October 2, 2007 at $2.05.

124.    As of May 2, 2005, the beginning of the Class Period, Smart Online's stock closed at $6.39 per share. As of September 28, 2007, when SOI entered into the consent judgment in the SEC lawsuit, Smart Online stock traded to close at $1.87 per share.

<u>INSIDER TRADES DURING THE CLASS PERIOD</u>

125.    Company insiders raced to the market to liquidate significant amounts of their personally-held Smart Online shares while in possession of material adverse non-public information about the Company, including:

| DATE | SELLER | # SHARES | PROCEEDS |
|---|---|---|---|
| 19-Jan-07 | MICHAEL NOURI | 900 shares | $2,700 |
| 19-Jan-07 | MICHAEL NOURI | 900 shares | $2,700 |
| 19-Jan-07 | MICHAEL NOURI | 521,709 shares | $1,306,179 |
| 19-Jan-07 | HENRI NOURI | 900 shares | $2,700 |
| 12-Jan-07 | MICHAEL NOURI | 301,085 shares | $51,000 |
| 12-Jan-07 | HENRI NOURI | 301,085 shares | $51,000 |
| 10-Oct-06 | MICHAEL NOURI | 160,000 shares | $243,000 |
| 10-Oct-06 | MICHAEL NOURI | 87,043 shares | $132,000 |

## POST-CLASS PERIOD DEVELOPMENTS

126.   On October 25, 2007, defendant Doolan entered into a partial consent judgment with the SEC in the SEC Civil Action.  Doolan consented, inter alia, "not to take any action or to make or to permit to be made any public statement denying, directly or indirectly, any allegation in the [SEC Complaint] or creating the impression that the [SEC Complaint] is without factual basis[.]"

127.   On February 11, 2008, Doolan pled guilty to conspiracy to commit securities fraud and securities fraud in the United States' criminal action against him. Sentencing is scheduled for September 24, 2008.

## ADDITIONAL ALLEGATIONS AGAINST AUDITOR DEFENDANT SHERB

128.   As confirmed by a hedge fund manager, and as reported on September 14, 2007 in The News & Observer:

> Ex-CEO of Smart Online out on bond
>
> While CEO of Smart Online, Michael Nouri agreed to hire outside auditors after the SEC had suspended its shares from trading in early 2006 over concerns of stock manipulation.
>
> "The trading halt was a huge red flag," said Yolanda Holtzee, a securities watchdog who co-manages a hedge fund in Seattle.
>
> A few months after the stock suspension, auditing firm Sherb & Co. of New York gave Smart Online a clean bill of health. Smart Online executives told the SEC there was no indication of fraudulent activity. The company also named a new chairman.
>
> Holtzee, who does not own shares of Smart Online, said she has a difficult time believing in the audit.  [Emphasis added.]

Sherb & Co. has been named in at least one civil suit over an alleged pump-and-dump scheme and was auditor for another firm under investigation by the SEC and the Commodity Futures Trading Commission, she said.

129.   In the 2006 10-K, defendant Sherb included a "Report of Independent Registered Public Accounting Firm," dated March 28, 2007, as follows:

> We have audited the accompanying consolidated balance sheets of Smart Online, Inc. as of December 31, 2006 and 2005, and the related consolidated statement of operations, stockholders' (deficit) equity, cash flows for each of the years then ended December 31, 2006, 2005 and 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Smart Online, Inc. as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years then ended December 31, 2006, 2005 and 2004, in conformity with accounting principles generally accepted in the United States.  [Emphasis added].

Unlike prior auditors engaged by the Company, who expressed reservations about the Company's ability to continue as a going concern, Sherb issued an unqualified opinion.

130.   Sherb, by virtue of its relationship with the services rendered to the Company, had full, complete, and intimate knowledge of Smart Online's financial

reporting practices based on access to confidential internal corporate, financial, operating, and business information.

131.    Sherb violated GAAP and SEC Rules by: (i) failing to disclose "any fraud, whether or not material"; (ii) failing to disclose the true financial condition of Smart Online; and, (iii) failing to establish and maintain adequate internal accounting controls to detect the fraudulent scheme.  Sherb knew or disregarded, or was severely reckless in not knowing or disregarding, the sham entries for consulting or investor relation fees, which really masked the bribes paid to brokers.  Sherb also knew or disregarded, or was severely reckless in not knowing or disregarding, the fact that the Company was under a cloud of suspicion because of the SEC suspension and NASDAQ disqualification.  By failing to fully disclose material information about Smart Online and issuing an unqualified opinion, Sherb contributed, continued, and advanced defendants' scheme.

132.   In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU § 326.01.  During the course of Sherb's audits of Smart Online, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter.  Sherb was engaged during the time period when the Company was under a cloud of suspicion in light of the SEC suspension and NASDAQ listing disqualification.  This fact alone should have led Sherb to more closely scrutinize the Company, its officers and directors, the Company's internal and financial controls

77

and reporting, and required additional evidential matter to properly support their unqualified opinion. Rather than do so, even when the Company's prior auditor, BDO, expressed concerns about the Company, Sherb issued an unqualified opinion.

133. Management's lack of integrity should, in all instances noted above, have caused Sherb to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. See AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04. Sherb did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in the financial statements and render an accurate audit report on behalf of Smart Online. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is a "[k]nown history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws." AU § 316.16. In this regard:

(a)     Sherb failed to disclose, or was severely reckless in not disclosing, any aspect of the manipulative scheme undertaken by the Smart Online

Defendants and Broker Defendants, including the fact that the bribes paid to brokers were masked as innocuous-sounding consulting or investor relation fees;

(b)     Sherb disregarded, or was severely reckless in not considering, the past history of defendants Michael Nouri and Henry Nouri and their previous associations with failed companies, including an Italian government order that neither defendant can serve as an officer or director of any Italian company; and,

(c)     Sherb disregarded, or was severely reckless in not considering, the fact that soon after the Company first listed on the OTC BB, the Company noted that it did not meet NASDAQ listing requirements, but only months after, it did meet NASDAQ listing requirements, without questioning or requiring additional evidential matter as to how the Company achieved such a NASDAQ listing in a compressed time frame.

134.    Sherb violated GAAS Standard of Reporting No. 3 that requires informative disclosures in financial statements to be regarded as reasonably adequate unless otherwise stated in the report.  Sherb knew or disregarded, or was severely reckless in not knowing or disregarding, that Smart Online's disclosures were not reasonably adequate due to the following:

(a)     Sherb failed to disclose, or was severely reckless in not disclosing, any aspect of the manipulative scheme undertaken by defendants, including the fact that the bribes paid to brokers were masked as innocuous-sounding consulting or investor relation fees;

(b) Sherb disregarded, or was severely reckless in not considering, the past history of defendants Michael Nouri and Henry Nouri and their previous associations with failed companies, including an Italian government order that neither defendant can no longer serve as an officer or director of any Italian company; and,

(c) Sherb disregarded, or was severely reckless in not considering, the fact that soon after the Company first listed on the OTC BB, the Company noted that it did not meet NASDAQ listing requirements, but only months after, it did meet NASDAQ listing requirements, without questioning or requiring additional evidential matter as to how the Company achieved such a NASDAQ listing in a compressed time frame.

135. Sherb violated GAAS General Standard No. 2 that requires that ndependence in mental attitude is to be maintained by the auditor in all matters related to the assignment. Sherb's failure to issue no opinion or to issue an adverse opinion in light of the material omissions detailed above reveals Sherb's lack of independence in auditing the books and records of Smart Online.

136. Sherb violated SAS No. 99 in that it failed to adequately consider the risk that the audit financial statements of Smart Online were free from material misstatement, as noted herein, whether caused by errors or fraud. Sherb knew or ignored, or was severely reckless in not knowing or ignoring, numerous material risks relevant to financial reporting including events and circumstances that occurred or existed at Smart

Online during the Class period, which adversely affected the Company's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

137.    Defendant Sherb violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial, and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.

138.    As a result of its issuance of an unqualified opinion, Sherb utterly failed in its role as an auditor as defined by the SEC.  SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit

function must be meaningfully performed and the accountants'
independence not compromised. The auditor must be free to decide
questions against his client's interests if his independent professional
judgment compels that result.

## ADDITIONAL ALLEGATIONS AGAINST INDIVIDUAL DEFENDANTS

139.    Much of the information relative to the manipulative acts complained of are

in the exclusive control of defendants. Moreover, the SEC and the United States

Attorney were aided in their investigatory efforts by the Federal Bureau of Investigation.

As the Government Actions progress and their prosecution continue, Lead Plaintiff will

gain additional information related to this lawsuit that could not otherwise be obtained as

a result of the government's non-public investigations.

140.    Because of the Individual Defendants' positions with the Company, and

because of their familial associations, they had access to adverse, undisclosed

information about each officer or director's activities relating to Smart Online, including

operations, products, operational trends, financial statements, markets, and present and

future business prospects via access to internal corporate documents (including the

Company's operating plans, budgets and forecasts and reports of actual operations

compared thereto), conversations, and connections with other corporate officers and

employees, attendance at management and Board of Directors meetings and committees

thereof and via reports and other information provided to them in connection therewith.

141.    It is appropriate to treat the Individual Defendants as a group for pleading

purposes and to presume that the false, misleading, and incomplete information conveyed

in Smart Online's public filings, press releases, and other publications as alleged herein

82

are the collective actions of the narrowly-defined group of defendants identified above.

Each of the above officers or directors, by virtue of their high-level positions with the

Company, directly participated in the management of Smart Online, was directly

involved in the day-to-day operations of SOI at the highest levels, and was privy to

confidential proprietary information concerning Smart Online and its officers'

backgrounds, the Company's business, operations, products, growth, financial statements,

and financial condition, as alleged herein. Defendants were involved in drafting,

producing, reviewing and/or disseminating false and misleading statements and

information, and were aware or knew and/or were severely reckless in not becoming

aware or knowing that false and misleading statements were being issued regarding

Smart Online and its officers' backgrounds, business, operations, products, growth,

financial statements, and financial condition, and approved or ratified these statements, in

violation of the federal securities laws.

142.    Each of the individual Defendants had a duty to ensure that all Smart

Online Defendants complied with all legal obligations and requirements, and a duty to

ensure that the Company was operated in a diligent, honest, and prudent manner in

compliance with all applicable federal, state, and local laws, rules, and regulations.

143.    As officers and controlling persons of a publicly-held company whose

common stock was, and is, registered with the SEC pursuant to the Exchange Act and,

during the Class Period, was traded on the OTC BB and Pink Sheets, and governed by the

provisions of the federal securities laws, the Individual Defendants, Broker Defendants,

and Doe Defendants each had a duty to disclose and disseminate promptly, accurate and truthful information with respect to Smart Online's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants', Broker Defendants', and Doe Defendants' misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

144.  The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, and other communications complained of herein and knew or were aware of, or were severely reckless in not knowing or becoming aware of, the materially false and misleading nature of misstatements contained therein and omissions therefrom. Because of their membership on the Board of Directors and/or executive and managerial positions with Smart Online, each of the defendants had access to the adverse undisclosed information about Smart Online's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects and knew, or were severely reckless in not knowing, that adverse facts rendered

the positive representations made by or about Smart Online and its financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects issued or adopted by the Company were materially false and misleading.

145.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Smart Online and issued during the Class Period.  Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein or omissions therefrom.

146.   Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Smart Online common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme was accomplished through both market manipulation of SOI stock on a national public exchange, and through false and misleading statements and the omission of material information.  The scheme: (a) deceived the investing public regarding Smart Online's business, operations,

management, and the intrinsic value of Smart Online's common stock; (b) enabled Smart Online to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material, adverse non-public information about Smart Online; and, (c) caused Lead Plaintiff and other members of the Class to purchase the Company's common stock at artificially-inflated prices and to be damaged thereby.

## BASIS OF ALLEGATIONS

147. Lead Plaintiff's allegations are based upon the investigation of Lead Counsel, which included a review of defendants' SEC filings and reports, analyst reports and advisories about the Company, press releases and other public statements issued by defendants, media reports, news articles, information available on the internet relating to defendants, and pleadings and filings made in connection with the Government Actions. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery which is currently exclusively in the possession of the defendants.

## ADDITIONAL SCIENTER ALLEGATIONS

148. As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state material facts; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws. Moreover, as set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Smart Online, their control over, and/or receipt and/or modification of Smart Online's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Smart Online, participated in the fraudulent scheme alleged herein.

149. Smart Online Defendants were motivated to materially misrepresent or omit to state material facts to investors because by deceiving the investing public regarding Smart Online's business, operations, management, and the intrinsic value of Smart Online's common stock, Smart Online was able to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material, adverse non-public information; to secure a listing on the NASDAQ by engaging in the scheme as alleged herein; and to sell or permit other Smart Online Defendants to sell substantial amounts of their Smart Online shares at inflated prices caused by their manipulation of the market for Smart online share and while exclusively in possession of other adverse non-public material information.

<u>NO SAFE HARBOR</u>

150. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as

"forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Smart Online who knew that those statements were false when made.

<u>CLASS ACTION ALLEGATIONS</u>

151.  Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Smart Online's common stock during the Class Period, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

152.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

153. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Smart Online's common stock was actively traded on the OTC Bulletin Board and on the Pink Sheets. As of April 27, 2007, the Company had over 17.872 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, which can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Smart Online or its transfer agent, who may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

155. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Smart Online; and,

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

PRESUMPTIONS OF RELIANCE

157.    At all relevant times, the market for Smart Online common stock was an efficient market (including in terms of informational efficiency) for the following reasons, including, among others:

(a)    Smart Online stock qualified for trading on the OTC BB -- a highly-efficient, open, developed, and automated market, free of manipulation  -- and began trading on April 15, 2005;

(b)    The Company then met the requirements for listing on NASDAQ -- a highly-efficient, open, developed, and automated market, free of manipulation  -- and was supposed to begin trading on that exchange on January 17, 2006, but the SEC ordered a suspension of trading;

(c)    Smart Online stock then traded on the Pink Sheets  -- a  highly-efficient, open, developed, and automated market, free of manipulation  -- on January 24, 2006;

(d)     The Company again obtained a listing on the OTC BB, and began trading there on September 11, 2006;

(e)     As a regulated issuer, Smart Online, defendants, and insiders of the Company filed periodic reports (including Form 4s) with the SEC, which were publicly available and readily accessible;

(f)     Smart Online regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(g)     Smart Online was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s), funds, and investment management companies,  including Access Markets International (AMI) Partners, Atlas Capital, S.A., Summit Strategies, Herald Investment Trust, and Chicago-based Magnetar Capital Master Fund, who studied and issued reports about SOI;

(h)     Defendants presented and participated in conferences attended by securities analysts and other interested parties, including the 2005 Wall Street Analyst Forum and the "Super Stock Challenge" Investment Conference held in New York, New York;

(i)     Information about the Company made its way to the internet instantly, simultaneously, or close in time to the point at which such information was disseminated, became public, or disclosed, including through such websites as yahoo.com, msn.com, aol.com, theflyonthewall.com, closingbellonline.com, buyins.net, and knobias.com, which made available, among other things, the Company's SEC filings, insider trading information, and historical stock price charts;

(j)     During the Class Period, Smart Online stock enjoyed substantial daily, weekly, or monthly trading volumes;

(k)     There were numerous market makers for Smart Online stock (including Maxim and JSLC); and,

(l)     The movement of Smart Online's stock price, as detailed above, for example, shows a cause and effect relationship between corporate events and an immediate response in the stock price.

158.   As a result of the foregoing, the market for Smart Online securities promptly digested current information regarding the Company from all publicly-available sources and fully reflected such information in Smart Online's stock price. Under these circumstances, all purchasers of Smart Online common stock during the Class Period suffered similar injury through their purchase of Smart Online common stock at artificially-inflated prices and a presumption of reliance applies. Moreover, claims for market manipulation are primarily based on the omission of material facts. Therefore,

with respect to all omissions of material fats by defendants, including the manipulation of

Smart Online shares during the Class Period, reliance is presumed as well.

COUNT I

(For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5<br>Promulgated Thereunder Against The Smart Online Defendants For<br>Materially False and Misleading Representations and Omissions)

159.    Lead Plaintiff repeats and re-alleges each and every allegation contained

above as if fully set forth herein.

160.    During the Class Period, the Smart Online Defendants carried out a plan,

scheme and course of conduct which was intended to and did, throughout the Class

Period: (a) deceive the investing public regarding Smart Online's business, operations,

management and the intrinsic value of the Company's common stock; (b) enable

defendants to negotiate the acquisitions of several other smaller companies, often using

Company stock as partial consideration, while in possession of material adverse non-

public information about Smart Online; and (c) cause Lead Plaintiff and all other

members of the Class to purchase the Company's common stock at artificially-inflated

prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants,

jointly and individually (and each of them) took the actions set forth herein.

161.    The Smart Online Defendants (a) employed devices, schemes, and artifices

to defraud; (b) made untrue statements of material fact and/or omitted to state material

facts necessary to make the statements not misleading; and, (c) engaged in acts, practices,

and a course of business which operated as a fraud and deceit upon the purchasers of the

Company's common stock in an effort to maintain artificially high market prices for Smart Online's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons.

162.   The Smart Online Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Smart Online as specified herein.

163.   The Smart Online Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of SOI common stock during the Class Period.

164.   Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level

94

executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading, or omitted to state material facts necessary to make the statements not misleading.

165.    The Smart Online Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe recklessness in disregarding the truth in that they failed to ascertain and to disclose such facts.  Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately for the purpose and effect of concealing Smart Online's operating condition and future business prospects from the investing public and supporting the artificially-inflated price of its common stock.  As demonstrated by the Smart Online Defendants' overstatements, omissions, and misstatements about the Company's business, operations, and earnings throughout the Class Period, defendants, if

they did not have actual knowledge of the misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading, or omitted to state material facts necessary to make the statements not misleading.

166. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Smart Online common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Smart Online Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by the Smart Online Defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and all other members of the Class acquired Smart Online common stock during the Class Period at artificially-high prices and were damaged thereby.

167. At the time of said misrepresentations and omissions, Lead Plaintiff and all other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and all other members of the Class and the marketplace known the truth about Smart Online that were not disclosed by the Smart Online Defendants, Lead Plaintiff and all other members of the Class would not have purchased or otherwise acquired their shares of the Company's common stock, or, if they had acquired such

common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

168.  By virtue of the foregoing, when the truth about the Smart Online Defendants' false and misleading statements began to be revealed, the price of Smart Online shares precipitously dropped causing a loss to lead plaintiff and all other members of the Class.  Thus, as a direct and proximate result of the Smart Online Defendants' wrongful conduct, Lead Plaintiff and all other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

169.  As a result of the foregoing, the Smart Online Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and are liable to Lead Plaintiff and the other members of the Class.

<u>COUNT II</u>

(For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Smart Online Defendants For Market Manipulation)

170.  Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

171.  During the Class Period, the Smart Online Defendants, singly and in concert, by use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Smart Online securities, knowingly or severely recklessly, carried out a plan, scheme, and course of conduct which was intended to and did: (a) employ devices,

schemes, and artifices to defraud; (b) make untrue statements of material fact and/or failed to disclose material facts necessary to make the statements not misleading; and (c) engage in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of SOI securities in an effort to maintain artificially high market prices and trading volume for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

172.   As part of and in furtherance of the unlawful scheme, plan, and course of conduct detailed herein, each of the Smart Online Defendants knowingly or severely recklessly engaged in some or all of the manipulative and fraudulent transactions, acts, practices, and courses of business described herein, including, among other things, failing to disclose the bribery scheme in an effort to create artificial demand in Smart Online stock.

173.   The Smart Online Defendants' unlawful scheme, plan, and course of conduct: (a) deceived the investing public, including Lead Plaintiff and members of the Class; (b) artificially created and inflated market prices of SOI's securities; (c) artificially created and inflated the trading volume of SOI's securities; (d) caused Lead Plaintiff and other members of the Class to purchase or otherwise acquire SOI securities at artificially inflated prices; and (e) caused damaged thereby to Lead Plaintiff and members of the Class, who believed that the market was free of manipulation, and who suffered losses when the truth was revealed regarding the market manipulation and the manipulation ceased, causing the price of Smart Online shares to precipitously decline in value.

174. Defendant Michael Nouri's liability, in addition, arises from the following facts: (a) Michael Nouri was a high level executive and director at the Company during the Class Period; (b) by virtue of his responsibilities and activities as President, CEO, and Chairman of the Board of SOI, he was privy to true undisclosed facts and participated in the creation, development, and reporting of the Company's materially false and misleading statements; (c) he created, with the assistance of all other defendants, sham consulting and investor relations agreements as vehicles through which he and the other defendants (including Eric Nouri) facilitated or paid bribes to each of the Broker Defendants, and failed to disclose or intentionally misrepresented these actions to the investing public; (d) he disseminated false and misleading information to the investing public regarding these consulting agreements, or was aware that the Company disseminated false and misleading information to the investing public regarding these consulting agreements; (e) he entered into said consulting or investor relation agreements with the intent to deceive the investing public; and (f) he, with the assistance of all other defendants, caused bribes to be paid to the broker Defendants with the intent to deceive the investing public as to the value of SOI securities.

175. Each of the remaining Smart Online Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe and reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Smart Online Defendants' material misrepresentations and/or omissions were done knowingly or severely recklessly

and for the purpose of supporting the artificially inflated price of SOI securities and trading volume.

176. At the time of the misrepresentations and omissions alleged herein, Lead Plaintiff and other members of the Class had no knowledge that the statements made by defendants were false or omitted to state material facts and believed them to be complete and true. Had Lead Plaintiff and other members of the Class and the marketplace known of the true facts regarding bribes paid by SOI, by and through Michael Nouri, Eric Nouri, the Doe Defendants, and the Broker Defendants, which were not disclosed by any of the defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their shares of Smart Online common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices.

177. By virtue of the foregoing, when the truth about the Smart Online Defendants' manipulation of the shares of Smart Online stock began to be revealed, the price of Smart Online shares precipitously dropped causing a loss to lead plaintiff and all other members of the Class. Thus, as a direct and proximate result of the Smart Online Defendants' wrongful conduct, Lead Plaintiff and all other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

178.    As a result of the foregoing, the Smart Online Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and are liable to Lead Plaintiff and the other members of the Class

## COUNT III

**(For Violation Of Section 20(a) Of The Exchange Act**
**Against Individual Defendants)**

179.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

180.    The Individual Defendants acted as controlling persons of Smart Online within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

181.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

182.   As set forth above, Smart Online and the Individual Defendants each violated Section 10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT IV

(For Violation Of Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c)
Promulgated Thereunder Against The Broker Defendants
and DOEs Defendants For Market Manipulation)

183.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

184.   During the Class Period, the Broker Defendants, singly and in concert, by use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Smart Online securities carried out a plan, scheme, and course of conduct which was intended to and did: (a) employ devices, schemes, and artifices to defraud; and (c) engage

in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of SOI securities in an effort to maintain artificially high market prices and trading volume for such securities.

185. As part of and in furtherance of the unlawful scheme, plan, and course of conduct detailed herein, each of the Broker Defendants knowingly or severely recklessly engaged in some or all of the manipulative and fraudulent transactions, acts, practices, and courses of business described herein, in an effort to create artificial demand in Smart Online stock.

186. Broker Defendants' unlawful scheme, plan, and course of conduct: (a) deceived the investing public, including Lead Plaintiff and members of the Class; (b) artificially created and inflated market prices of SOI's securities; (c) artificially created and inflated the trading volume of SOI's securities; (d) caused Lead Plaintiff and other members of the Class to purchase or otherwise acquire SOI securities at artificially inflated prices; and (e) caused damaged thereby to Lead Plaintiff and members of the Class, who believed that the market was free of manipulation.

187. All of the Broker Defendants and DOEs Defendants were actual participants in the manipulative scheme complained of herein and were employees of the Manipulation Defendants.

188. The Broker Defendants and the DOEs Defendants benefited financially from the manipulative scheme by charging fees and sales charges to unsuspecting customers.

189.   Because  defendants Maxim and JLSC are members of FINRA and NASDAQ, and governed by the rules and regulation and The National Association of Securities Dealers (NASD), they had a duty to the investing public to ensure the existence of an effective oversight system to review transactions to ensure that no manipulative, deceptive or fraudulent conduct occurs.

190.   The NASD has rules that set out the duties and obligations of Maxim and JLSC.  Rule 2120 states that "No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."  Rule 3010 provides that the "final responsibility for proper supervision shall rest with the member."

191.   As alleged herein, Maxim and JLSC failed to have a system in place to ensure that the Broker Defendants were not engaged in a manipulative scheme and are therefore liable for the conduct of the Broker Defendants.

192.   Not only did the Maxim and JLSC fail in their duty to properly supervise the actions of the Broker Defendants, but they were motivated to turn a blind eye to the manipulative and illegal conduct of defendants Serrano, Lustig, Martin, Doolan and the DOEs Defendants because they financially benefitted from the manipulation scheme.

193.   As such, the Broker Defendants and the DOEs  Defendants have each violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5.

194.   As a direct and proximate result of each of the Broker Defendants' and the DOEs Defendants' conduct, Lead Plaintiff and other members of the Class suffered

damages in connection with their respective purchases and sales of Smart Online common stock when the manipulation scheme was revealed and/or ceased and the price of Smart Online share precipitously declined and caused losses to Lead Plaintiff and the other members of the Class.

COUNT V

(For Violation Of Section 10A and 10(b) Of The Exchange Act, and Rule 10b-5<br>Promulgated Thereunder Against Defendant Sherb)

195.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

196.    Defendant Sherb (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Smart Online's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

197.    Defendant Sherb, individually and in concert with the other defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Smart Online as specified herein.

198. Defendant Sherb employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of SOI common stock during the Class Period.

199. Defendant Sherb's primary liability arises because Defendant Sherb purportedly audited the Company's financial statements and issued an unqualified opinion, which was false and misleading. Without the materially false and misleading unqualified audit opinion, the scheme alleged would not have been possible.

200. Defendant Sherb stated that the Company's financial statements were in conformity with the generally accepted accounting principles, having full, complete and intimate knowledge of Smart Online's financial reporting practices that showed the adverse facts alleged herein concerning the Company's improper conduct. Thus, the Auditor Defendant knowingly, or recklessly, issued a false and misleading unqualified audit opinion during the Class Period.

201. Defendant Sherb contributed and advanced the manipulation scheme by failing to disclose material information about the Company and by issuing the unqualified opinion.

202. Defendant Sherb failed to have procedures in place designed to provide reasonable assurance of detecting illegal acts, designed to identify related party transaction that are material to the financial statements and evaluate whether there is substantial doubt about the ability of the issuer to continue as a going concern during the fiscal year.

203. Defendant Sherb also failed to comply with the provisions of Section 10A of the Exchange Act by failing to determine whether it was likely the Company had engaged in an illegal act, determine the effect of the illegal act on the Company's financial statements, and take proper remedial action by informing appropriate management and ensuring that the Audit Committee was informed about the illegal act.

204. Defendant Sherb failed to disclose or was severely reckless in not knowing or disregarding the illegal acts and the manipulation scheme in place and/or ignoring clear and present evidence that the Smart Online Defendants were engaged in an illegal scheme to manipulate the price of Smart online stock through bribes paid by Smart Online Defendants.

205. Defendant Sherb also failed to disclose or was severely reckless in not knowing or disregarding that the Company's disclosures were not adequate and that Smart Online had no meaningful internal financial accounting and reporting controls or

mechanisms in place necessary to provide adequate assurance to satisfy the financial accounting and reporting requirements of GAAP, GAAS and/or SOX.

206.    As a result of issuing of the unqualified opinion, Defendant Sherb violated Section 10(b) and 10A of the Exchange Act, and Rule 10b-5.

207.    As a direct and proximate result of Defendant Sherb's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

WHEREFORE, Lead Plaintiff and the members of the Class pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Rules 64 and

65 of the Federal Rules of Civil Procedure, and any appropriate state law remedies, to

assure that the Class has an effective remedy; and,

E.     Such other and further relief as the Court may deem just and proper.

<u>JURY TRIAL DEMANDED</u>

Lead Plaintiff and the Class hereby demand a trial by jury.

Dated: September 8, 2008.

Respectfully submitted,


/s/  S. Ranchor Harris, III
S. Ranchor Harris, III (Bar # 21022)
2504 Woodbine Road
Winston-Salem, North Carolina  27104
Tel: 336-722-3488

Liaison Counsel for Lead Plaintiff
  and the Class


BROWER PIVEN
  A Professional Corporation
David A.P. Brower
488 Madison Avenue, 8th Floor
New York, New York  10022
Tel: 212-501-9000
Fax: 212-501-0300


KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn
650 Poydras Street, Suite 2150
New Orleans, Louisiana  70130
Tel: 504-455-1400
Fax: 504-455-1498

109

KAHN GAUTHIER SWICK, LLC
Kim E. Miller
12 East 41st Street, 12th Floor
New York, New York  10017
Tel:  212-696-3730
Fax: 504-455-1498

Lead Counsel for Lead Plaintiff and the
Class

## PLAINTIFF'S CERTIFICATION

Mary Jane Beauregard ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff's transactions in Smart Online, Inc. securities during the Class Period are attached hereto.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of September 2008.

Mary Jane Beauregard
Mary Jane Beauregard

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: 410-332-0030
Facsimile: 410-685-1300
www.browerpiven.com

# Mary Jane Beauregard
## Smart Online, Inc. Securities Litigation
### Schedule of Class Period Transactions

| Date | Type | No. of Shares | Price |
|------|------|---------------|-------|
| 8/19/2005 | BUY | 5,500 | $9.00 |
| 8/24/2005 | BUY | 1,600 | $9.00 |
| 8/25/2005 | BUY | 1,000 | $8.95 |
| 8/29/2005 | BUY | 1,000 | $9.40 |
| 9/6/2005 | BUY | 1,400 | $9.85 |
| 9/6/2005 | BUY | 800 | $10.00 |
| 9/8/2005 | BUY | 500 | $10.00 |
| 9/8/2005 | BUY | 1,000 | $9.95 |
| 10/4/2005 | BUY | 4,000 | $8.00 |
| 10/4/2005 | BUY | 2,500 | $7.60 |
| 10/11/2005 | BUY | 467 | $9.05 |
| 12/26/2006 | SELL | 11,500 | $1.75 |
| 1/8/2007 | SELL | 2,300 | $1.95 |
| 3/15/2007 | SELL | 5,967 | $2.68 |