UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

---

MARY JANE BEAUREGARD, On Behalf
of Herself and All Others Similarly
Situated

                 Lead Plaintiff,

   vs.

SMART ONLINE, INC., *et al.*

                Defendants.

Civ. No. 07-CV-00785-WO-PTS

---

**DECLARATION OF DAVID A.P. BROWER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PARTIAL CLASS SETTLEMENT, PLAN OF ALLOCATION, AND AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, David A.P. Brower, declare as follows:

      1.      I am a principal of the law firm Brower Piven, A Professional Corporation ("Brower Piven"). Brower Piven, along with Kahn Swick & Foti, LLC ("KSF"),[1] is Court-appointed Lead Counsel[2] for Lead Plaintiff Mary Jane Beauregard ("Lead Plaintiff") in the above-entitled class action litigation (the "Litigation").

---

[1] At the time of the appointment, KSF was known as Kahn Gauthier Swick, LLC.

[2] Unless otherwise defined herein, any capitalized term will have the same meaning as set forth in the Stipulation of Settlement filed with the Court on June 21, 2010 (D.E. No. 61).

2.     I submits this declaration in support of Lead Plaintiff's motion for an Order: (1) finding that the forms and methods for providing notice to the Class[3] met the requirements of Fed. R. Civ. P. 23(c) and (e), and due process; (2) granting final certification, for the purposes of effectuating the proposed partial settlement, of the Class; (3) granting final approval of the proposed partial settlement (the "Settlement") of this class action on the the terms and conditions set forth in the Stipulation of Settlement filed June 21, 2010 (the "Stipulation")[4]; (4) granting approval of the proposed plan of allocation of Settlement proceeds (the "Plan of Allocation"); and (5) granting Lead Counsel an award of attorneys' fees and reimbursement of litigation expenses as compensation for their efforts in prosecuting the Litigation and obtaining the Settlement.

3.     I have personal knowledge of the facts set forth herein and, if called upon, I could and would competently testify thereto.

4.     The Stipulation was entered into between Lead Plaintiff, on behalf of herself and the Class, and the Settling Defendants, through their respective counsel. The Settlement provides for "Settlement Compensation" consisting of: 1,500,000 freely tradable shares of SOL common stock (the "Stock Contribution"); $462,500 in cash (the

---

[3]  "Class" means all Persons who purchased or otherwise acquired publicly traded securities of Smart Online, Inc. ("SOL") between May 2, 2005 through September 28, 2007, inclusive. Excluded from the Class are the Defendants, officers and directors of SOL, their immediate families, legal representatives, heirs and assigns, and any entity in which any excluded Person has or had a controlling interest. Also excluded from the Class are those Persons who timely and validly request exclusion from the Class.

[4]  All capitalized terms that are not defined herein shall have the same meanings as set forth in the Stipulation.

"Cash Contribution"); and the right to receive all future recoveries obtained by SOL on any and all of its claims against non-settling defendants, Sherb & Co., LLP ("Sherb"), Ruben Serrano ("Serrano"), Alan Lustig ("Lustig"), Anthony Martin ("Martin"), James Doolan ("Doolan"), Maxim Group, LLC ("Maxim"), and Jesup & Lamont Securities Corp. ("Jesup & Lamont") (collectively, the "Non-Settling Defendants"). The Settlement fully, finally, and forever resolves, discharges, and settles the Released Claims.

5.     For the reasons discussed in detail herein, I submit that the notice provided to the Class was the best notice practical under the circumstances and met the requirements of the Federal Rules of Civil Procedure and due process, that the Class meets all of the requirement for certification under Fed. R. Civ. P. 23 (a) and (b)(3); that the Settlement is fair and adequate in accordance with the Fourth Circuit's *Jiffy Lube* factors; that the Plan of Allocation of the proceeds of the Settlement, which simulates the method that Lead Plaintiff was most likely to present to the trier of fact to prove Class damages, is fair and equitable; and that the requested attorneys' fees and reimbursement of expenses to Lead Counsel are reasonable.

## LEAD PLAINTIFF'S PROSECUTION OF THE CASE

**Commencement of the Litigation and Appointment of Lead Plaintiff**

6.     The initial complaint in this Litigation, *Gooden v. Smart Online, Inc., et al.*, Civ. No. 07-CV-00785-WO-PTS (M.D.N.C.), was filed in this Court on October 18, 2007. Pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(a-f) (the "PSLRA"), plaintiff Gooden issued notice of the filing of the case over the

3

Internet and all other proceedings were accordingly stayed as required by the statute pending the lead plaintiff appointment process.

7.      Pursuant to the PSLRA, on December 17, 2007, two competing motions for consolidation of the action[5], appointment as lead plaintiff, and approval of selection of counsel were filed.  There followed full briefing on the motions, during which Lead Counsel thoroughly reviewed each movant's claimed losses and analyzed their adequacy to lead the litigation.

8.      On June 24, 2008, the Court consolidated all related actions with *Gooden v. Smart Online, et al.*; appointed Mary Jane Beauregard as Lead Plaintiff pursuant to 15 U.S.C. § 78u-1(a)(3)(B)(iii)(I)(aa); and approved her selection of Brower Piven and KSF as Lead Counsel for the Class, and S. Ranchor Harris, III, as Liaison Counsel for the Class.

**Lead Counsel Investigates, Researches, Drafts, and Files the Complaint**

9.      Given that Lead Counsel viewed the Gooden complaint as too superficial and insubstantial to meet the pleading requirements of the PSLRA, immediately following her appointment, Lead Plaintiff and her counsel initiated an intensive and wide-ranging investigation into the facts and circumstances surrounding defendants' alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j (the "Exchange Act"), and Securities & Exchange Commission ("SEC")

---

[5]   No other actions were filed subsequent to the filing of the initial complaint; movants noted that if additional securities actions were filed alleging the same course of conduct and similar or identical claims against the same or similar defendants, consolidation would be proper pursuant to Fed. R. Civ. P. 42(a).

Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

10. In connection with these efforts, Lead Counsel: (a) conducted a full investigation into the facts and circumstances surrounding the events at SOL; (b) thoroughly reviewed and analyzed SOL's public statements, including SEC filings, and SOL stock trading during the Class Period; (c) retained a market economist as an expert consultant to analyze the trading, volumes, and prices to determine the impact of the alleged manipulation of SOL stock on its publicly traded securities; (d) collected and reviewed analyst reports and major financial news service reports on SOL; (e) analyzed the potential for claims against a large population of additional persons and entities that were not named as defendants in the nascent Gooden complaint; (f) reviewed news articles and message board postings and the available records of the criminal proceedings against certain of the SOL and broker defendants; and (d) engaged in extensive legal research on market manipulation claims under the federal securities laws. Based upon this in-depth investigation and analysis, Lead Counsel prepared the operative Complaint.

11. On September 8, 2008, Lead Plaintiff filed the operative Complaint under the captioned *Beauregard v. Smart Online, Inc., et al.*, which named as defendants SOL; the Individual Defendants, Nicholas A. Sinigaglia, Scott Whitaker, David E.Y. Sarna, Dennis Michael Nouri ("Michael Nouri"), Reeza Eric Nouri ("Eric Nouri"), Henri Nouri, Ronna Loprete, Frank C. Coll,, C. James Meese, Jr., Philippe Pouponnot, Shlomo Elia, Jeffrey W. Lerose, Thomas P. Furr, Sherb, Serrano, Lustig, Martin,, Doolan, Maxim Group, LLC ("Maxim"), and Jesup & Lamont.

5

12.     Moreover, throughout the course of this Litigation, Lead Counsel continuously supplemented their investigation as additional information was acquired or as new events transpires in what became a very fluid situation.

**The Allegations of the Complaint**

13.     The Complaint alleges violations of federal securities laws on behalf of the Class.  Lead Plaintiff asserts that Defendants created and participated in a fraudulent scheme to manipulate artificially the price by creating the appearance of larger market demand for its shares.  The Complaint alleges that this scheme involved bribery of stockbrokers by SOL management, and that the bribed brokers solicited purchases of more than 267,000 shares of SOL stock from investors, which accounted for approximately 10% of the trading volume from May 2005 to January 2006.

14.     As alleged in the Complaint, during that period, defendants did not disclose details of the underlying bribery and kickback scheme.  Instead, defendants concealed the payments by falsely portraying them as consulting or investor relation fees and agreements.  These consulting and investor relation fees and agreements were alleged in the Complaint to be disguised illegal payments to the brokers to induce them to and compensate them for actively participating and effectuating the manipulation of SOL's shares.

15.     SOL began trading on the National Association of Securities Dealers' Over-the-Counter Bulletin Board ("OTC BB") on April 15, 2005, with an opening stock price of $1.50 per share.  Issuers of all securities quoted on the OTC BB are subject to

6

periodic filing requirements with the SEC or other regulatory authority.

16.     In the ensuing months, the Complaint alleges that defendants put into effect a scheme to increase stock trading volume and the overall number of shareholders in order to qualify for a listing on the NASDAQ Capital Market ("NASDAQ").   A NASDAQ listing would increase SOL's visibility, reputation, and its ability to raise new equity financing.   Defendants, however, never disclosed the method that would be employed to obtain that valuable and important listing for SOL shares.

17.     The Complaint alleges that Defendants' scheme worked; artificially inflating both SOL's stock price and volume, duping investors into believing SOL was more valuable as an investment and that market interest in SOL was greater than it was, and inducing investors to purchase SOL shares at artificially manipulated prices, which further inflated those prices.   As a result of this alleged fraudulent and manipulative scheme, SOL qualified for a NASDAQ listing.

18.     On January 17, 2006, however, the day that SOL was scheduled to begin trading on NASDAQ, the SEC issued an Order of Suspending of Trading, stating:

> It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of Smart Online, Inc. ("SOLN") because of possible manipulative conduct occurring in the market for the company's stock.
>
> The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above listed company.
>
> Therefore, it is ordered, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is

suspended for the period from 9:30 a.m. EST, on January 17, 2006
through 11:59 p.m. EST, on January 30, 2006.

19.    In response to the Order of Suspending of Trading, NASDAQ rescinded SOL's qualification and the OTC BB suspended SOL from trading on January 24, 2006. Thereafter, SOL stock began trading on the Pink Sheets, until SOL again obtained a listing on the OTC BB on September 11, 2006.

20.    In March 2006, SOL tasked its Audit Committee and outside legal counsel to conduct an independent internal investigation of matters relating to the SEC suspension. On July 7, 2006, without disclosing the actual report authored by the Audit Committee and outside legal counsel, SOL issued a release claiming that no "officers or directors have engaged in fraudulent or criminal activity."

21.    Despite this public pronouncement and reassurance by SOL, on September 11, 2007, after an extensive investigation, the SEC filed an injunctive complaint in the United States District Court for the Southern District of New York, Docket No. 07-7960 (PKC) (the "SEC Complaint"), naming the following as defendants: SOL, Michael Nouri, Eric Nouri, Martin, Doolan, Serrano and Lustig. That same day, Michael Nouri, Eric Nouri, Serrano, Martin, Doolan and Lustig were arrested and charged by the United States in the Southern District of New York with federal securities fraud and conspiracy to commit securities fraud.

22.    On November 8, 2007, the United States filed grand jury criminal Indictments (the "Indictments") in the Southern District of New York against Michael Nouri, Eric Nouri, Serrano and Lustig. On December 20, 2007, and February 11, 2008,

8

defendants Martin and Doolan, respectively, waived indictment and the United States instead filed an Information against them. Ultimately, all defendants in the criminal actions were convicted of federal securities fraud, either through pleas or trials. Defendants Michael and Eric Nouri, who were tried, continue to appeal their convictions.[6]

23.     In addition to alleged devices, scheme, and artifice allegedly intended to defraud investors by manipulating SOL's share price and volume, defendants are alleged to have published or participated in publishing a series of materially false and misleading statements, which Lead Plaintiff alleges defendants knew, or should have known (but for their severe recklessness), were materially false and misleading at the time of such publication, and which omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading. Moreover, the Complaint alleges that throughout the Class Period, Defendants are alleged to have failed to disclose that SOL lacked requisite internal controls and procedures and that its financial reports were seriously flawed, misleading, and lacking in reasonable basis and could not be relied upon.

24.     The Complaint alleges that by virtue of defendants' manipulative conduct and false and misleading statements and omissions, investors were deceived regarding the underlying economic value of SOL's securities; and that when the truth of this scheme

---

[6]   In the Complaint, the SEC action and the numerous criminal cases brought by the United States Attorney brought in connection with the manipulation of SOL securities are referred to collectively as the "Government Actions."

was finally and fully revealed, the price of SOL shares declined and Lead Plaintiff and the other members of the Class were damage thereby.

25.     As the Complaint alleges, the truth about the manipulative conduct, defendants' material misstatements and omissions, and the precise involvement of defendants was revealed in partial stages.  After the initial revelation in January 2006 that SOL's stock had been afflicted by manipulative conduct, investors thereafter learned, when SOL issued its Form 10-K for the fiscal year ended December 31, 2005, filed July 11, 2006, of the complete disregard for standards of corporate governance that permeated SOL, including: (a) inadequate diligence by management and the Board of Directors regarding third parties with which SOL contracted, including outside investor relations vendors, some of which were registered brokers; (b) SOL's management and directors lacked sufficient knowledge regarding rules and regulations with respect to dealings between registered brokers and public companies; (c) there was inadequate legal and accounting review of material contracts; (d) there was inadequate training and understanding of SEC disclosure requirements; (e) there was a failure to communicate and to stress the importance of controls and procedures throughout SOL; and, (f) defendant Michael Nouri failed to set and follow proper corporate governance and compliance requirements as SOL moved from being a private company to being a public company.

26.     The Complaint further alleges that on September 11, 2007, the day several defendants were arrested by federal authorities and the SEC filed against them, investors

came to realize that the manipulative conduct taking place at SOL was, in fact, at the behest of its Chief Executive Officer, the highest-ranking official at SOL. A little more than two weeks after the arrests, SOL entered into a "Final Judgment" restraining and enjoining SOL and its agents, servants, employees, attorneys, and all persons acting in concert or participation with them from violating, directly or indirectly, § 10(b) of the Exchange Act and Rule 10b-5, and § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

**Post-Complaint Procedures**

27.     Ten days following the filing of the Complaint, on September 18, 2008, Lead Plaintiff filed a Corrected Complaint, alleging the same facts and false and misleading statements, which edited the text to accurately reflect the document title. On October 2, 2008, the Court issued a case management schedule setting the deadlines for defendants to respond to the Complaint, in the form of an Answer or a motion to dismiss. The deadline for the response was October 17, 2008. If the response came in the form of a motion to dismiss, the deadline for Lead Plaintiff's opposition was December 1, 2008, and the deadline for defendants' reply in support was January 15, 2009.

28.     On October 15, 2008, certain of the Parties, including Lead Plaintiff, filed a joint motion to amend the case management schedule. On October 21, 2008, defendant Maxim moved for an extension of their time to respond to the Complaint. On October 19, 2008, the Court issued an Order revising the case management schedule, and providing that: no defendant was required to respond to the Complaint until after service

was completed on all defendants named in the Complaint; Lead Plaintiff was relieved from the requirements of Local Rule 23.1(b); and within 15 days of completion of service on all defendants named in the Complaint, the parties were to present to the Court a revised case management order governing responses to the Complaint and briefing on any motions to dismiss and in the event that the Parties were unable to agree on any matter regarding scheduling, the parties were to submit separately any such dispute to the Court at the time they submitted their agreed-upon revised cases management order for resolution in the manner determined by the Court after appropriate briefing.

29.     On October 21, 2008, defendant Maxim filed a motion requesting to be added to the amended case management schedule, and on December 12, 2008, that motion was granted.

30.     Pursuant to the Court's order, Lead Plaintiff undertook to execute service on all defendants.  These efforts were ultimately successful, but required serving certain defendant through the Federal Prison Authority.

**The Filing of the SOL Action**

31.     While settlement negotiations were ongoing, on March 26, 2010, SOL filed a complaint, *Smart Online, Inc. v. Sherb & Co., LLP, et al.*, No. 10-244 (M.D.N.C.), against Doolan, Lustig, Serrano, Jesup & Lamont and Sherb, asserting claims, *inter alia*, for racketeering under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (civil remedies for RICO violations), fraud, negligence and malpractice (the "Direct Action") . On June 17, 2010, Sherb moved to consolidate the

instant class action securities litigation with the Direct Action. Defendants Doolan, Lustig and Serrano have failed to answer or otherwise respond, and defendant Jesup & Lemont has since filed for protection under Chapter 11 of the United States Bankruptcy Code and the claims against it are subject to the automatic stay provisions of that statute.[7]

**Sherb Motion to Dismiss**

32.     On October 25, 2010, Sherb moved to dismiss the Complaint. On November 4, 2010, Lead Plaintiff moved to strike or stay the Sherb motion to dismiss, and on November 15, 2010, Sherb filed an opposition to the motion to strike or stay. On November 18, 2010, Lead Plaintiff filed an opposition to the Sherb motion to dismiss, and on November 19, 2010, filed a reply in support of her motion to strike or stay the motion to dismiss. Sherb filed a reply in support of their motion to dismiss on December 14, 2010. There has been no scheduled oral argument with respect to Sherb's motion to dismiss before the Court.

33.     On December 6, 2010, the Court held a hearing on preliminary approval of the Settlement. At that hearing, the Court also heard arguments from the parties regarding Sherb's motion for consolidation of this Litigation with the Direct Action and regarding scheduling Sherb's motion to dismiss for argument, but the Court deferred addressing those issues. The Court did permit the parties to supplement the existing briefing on Sherb's motion to consolidate with regard to the applicability and effect of the

---

[7] On October 14, 2010, Jesup & Lamont filed a Notice of Bankruptcy, and on November 19, 2010, filed an Amended Notice of Bankruptcy. The Action was administratively terminated as to Jesup & Lamont on December 9, 2010.

Securities Litigation Uniform Standards Act of 1998 to this Litigation and/or the Direct Action. On December 20, 2010, the Lead Plaintiff and Sherb respectively submitted their supplemental memoranda. *See* Rec. Doc. Nos. 34 and 35.

**Settlement Negotiations**

34.     Lead Counsel and counsel for the Settling Defendants began settlement discussions soon after the filing of the Complaint, beginning with an in-person meeting between the parties in April 2008, in New York City. Settlement discussions continued almost continuously thereafter until the filing of the Stipulation in June 2010, consisting primarily of telephonic and email exchanges between Lead Counsel and counsel for SOL and the Nouris, respectively.

35.     The Settlement negotiations in this Litigation were unusually complex because of the ongoing government criminal and civil investigations and proceedings. Moreover, at a very early stage it became clear that the little directors' and officers' insurance ("D&O") coverage that SOL had was exhausted by its own defense in the government proceedings and for those of the other defendants in those proceedings who were entitled to coverage for their defenses costs under those policies. Indeed, at a very early stage, SOL itself was required to begin advancing the cost of the defenses of the Nouris in the criminal actions under SOL's indemnification agreements with those defendants because the D&O insurance was exhausted. Thus, SOL and the Individual Defendants had no insurance to compensate Class members in the Litigation.

36.     Lead Counsel also carefully investigated the financial condition of SOL to determine SOL's ability to make cash or other contributions to a settlement. That investigation led to the conclusion that SOL had few assets or other resources to pay in settlement. Recognizing the practical reality that SOL could not respond to a substantial judgment and the clear risk (indeed, almost a certainty) that even the cost of continued litigation well short of reaching judgment itself would likely drive SOL into bankruptcy (relegating Class Members to the status of unsecured equity creditors – and thus likely to recover nothing on their claims in a bankruptcy priority scenario), Lead Counsel and counsel for SOL spent many months negotiating a package that would include cash, stock and whatever other consideration that Lead Plaintiff could obtain from SOL.

37.     The negotiation on the terms of the Settlement were, therefore, extremely complex and time-consuming. The negotiation of the cash portion of the consideration required detailed analysis by both sides as to the amount that SOL could pay and still function. Likewise, the negotiation of the stock portion of the payment required careful consideration of the amount of shares that would create a sufficiently fair and adequate common fund while not so diluting SOL's outstanding equity shares to an extent as to render its thinly publicly shares and the settlement shares worthless. Another consideration, given that stock would represent a significant portion of the Settlement Consideration, was that the number of shares paid in settlement would still provide SOL with the sufficient potential ability to sell new equity to outside investors to raise future capital in its effort to be a successful operating company. Therefore, both the number of

15

shares and the restrictions on those shares were negotiated for many months.

38.     Finally, at Lead Counsel's insistence, Lead Plaintiff negotiated for and obtained SOL's agreement to pursue its claims against the Non-Settling Defendants under the federal and state law and to agree to pay over any of its recoveries on those claims to the Class.   Indeed, as an inducement to Lead Plaintiff entering into the Stipulation, SOL agreed to commence the Direct Action.  Further, all Settling Defendants agreed to cooperate in the pursuit of the Direct Action.   In connection with the assignment of SOL's recoveries, Lead Counsel engaged in extensive analysis of all potential claims that SOL could assert against a very wide population of potential defendants, drafted a complaint to pursue those claims, and consulted with SOL and its counsel regarding the institution of the Direct Action.  In the course of negotiating these terms, the parties spent many months discussing the nature of the claims and defendants and the means by which the claims would be asserted.

39.     Crafting this innovative and creative Settlement here, in the face of multiple hurdles such as the lack of a meaningful source of recovery fro the claims against the Settling Defendants, the criminal proceedings which threatened to delay this Litigation until its (yet to occur) final conclusion, the tension between SOL's litigation and business needs and goals, and the number of parties, demonstrates the difficulty Lead Plaintiff faced here from the outset.

40.     Nevertheless, after persevering through extensive, hard-fought negotiations, Lead Counsel and Lead were able to obtain 1,500,000 (which include both new treasury

16

shares as well as already issued and outstanding shares to be paid by Henri Nouri); $462,500 in cash (paid by SOL and Maxim), and the right to receive all of the potential recoveries that SOL's obtains through its litigation of the Direct Action.

**Preliminary Approval of Settlement and Notice to the Class**

41.     Once an agreement in principle to settle the Litigation had been reached, Lead Counsel undertook the task of documenting the Settlement.  This included not only negotiating and drafting the Stipulation, including the complexities of a multi-part Settlement comprising stock, cash, and right to receive the possible future recoveries from the Direct Action, but also crafting the Exhibits to the Stipulation, including the draft Notice of Pendency which was to be sent to Class Members and the Summary Notice which would be published in the course of the Notice proceedings.

42.     In anticipation of preliminary approval of the Settlement, and given the small amount of cash available from the Settlement, Lead Counsel negotiated an extremely beneficial fixed-cost arrangement with one of the nations leading professional claims administration firms, The Garden City Group, Inc. ("GCG"), thereby assuring not only excellent service to the Class, but at a significant cost savings. Thereafter, Lead Counsel began coordinating with GCG's senior director of operations to put into place the mechanics necessary to issue Notice to the Class.

43.     As noted above, on June 21, 2010, Lead Counsel filed papers in support of preliminary approval of the Settlement, including filing the Stipulation and accompanying exhibits.

44. By Order dated January 13, 2011 (the "Preliminary Approval Order"), the Court preliminarily approved the terms of the Settlement and directed that the Claims Administrator cause the mailing of the Notice of Pendency, Proposed Settlement of Class Action, Settlement Hearing and Request for Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release form (the "Proof of Claim") to all potential Class Members identifiable with reasonable effort.

45. The Court's Preliminary Approval Order also directed Lead Counsel to cause the notice for publication ("Summary Notice") to be issued twice over a widely-disseminated news media wire service, the *Business Wire* or *PR Newswire*.

46. Annexed hereto as Exhibit A is the Affidavit of Jason Zuena (the "Zuena Aff."). Jason Zuena is a Senior Director of Operations of GCG, the Court-appointed Claims Administrator, and his Declaration reports on the Notice procedure carried out in accordance with the Preliminary Approval Order.

47. As the Zuena Affidavit states, approximately 3,405 Notices and Proof of Claim forms have been mailed to Class Members, nominees, and brokers since January 25, 2011, and that the Summary Notice was published over the *Business Wire* on February 1, 2011 and February 8, 2011, in compliance with the provisions of the Preliminary Approval Order.

48. The Notices, which was ultimately mailed to over 3,400 potential Class Members, informed Class Members of the terms of the Settlement, the Plan of Allocation

18

of the Settlement proceeds, and that Lead Counsel would move the Court to award attorneys' fees in an amount not greater than thirty-three and one third percent ($33^{1}/_{3}\%$) of the Gross Settlement Fund, and for reimbursement of expenses incurred in connection with the prosecution of this Action, not to exceed $100,000.

49.     The Notice provided that any objections to the Settlement, the Plan of Allocation and/or the application of attorneys' fees and reimbursement of expenses had to be filed by March 15, 2011.  As of this date, only one objections to the Settlement has been received and no objections have been received have been filed from any Class Members to the Plan of Allocation, application for attorneys' fees, or reimbursement of expenses, and no Class member has yet requested exclusion from the Class.

50.     The deadline to object to the Settlement, the Plan of Allocation and/or Lead Counsel application for an award of attorneys' fees and reimbursement of expenses is April 18, 2011.  Following the expiration of that deadline, Lead Counsel will supplement their filings to address any objections that have been received as well as any other matters that may arise.

## THE SETTLEMENT IS FAIR AND ADEQUATE

51.     Throughout the course of these negotiations, all parties were represented by counsel with extensive experience in securities class actions. There can be no question that the Settlement was the result of vigorous arm's-length negotiations.

52.     As a result of Lead Plaintiff's extensive investigation, Lead Plaintiff and Lead Counsel have been able to asses the risks attendant on this case.  They have

considered the risks of litigation, the likelihood of defeating Defendants' motion or motions to dismiss, the likelihood of attaining class certification, the likelihood of obtaining strong evidence in support of the claims and defeating summary judgment after deposition discovery, and, if successful on the motion for summary judgment, the substantial risk, expense, and length of time to prosecute the Litigation through trial and the inevitable subsequent appeals. They have also considered the monetary benefit provided by the Settlement in light of the risk of taking the case to trial, which benefit was the greatest which could be obtained in light of the Company's limited insurance coverage and financial resources, and the unlikelihood that the Company could withstand a greater judgment.

53.    Lead Counsel also have considered the Settlement in light of economic realities, most significantly the risk that even if Lead Plaintiff were to successfully litigate the action to verdict, a judgment in excess of the amount of the Settlement might have forced SOL into bankruptcy and the Class might never recover any of their losses.

54.    Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Attorneys at Lead Counsel's firms that represented Lead Plaintiff here have extensive experience successfully litigating securities class actions on behalf of investor classes and have a national reputation in this field as vigorous advocates. In these unusual circumstances, Lead Counsel was required to call upon that vast experience to negotiate and structure the complex and creative Settlement here.

55. Lead Counsel respectfully submit that the Settlement represents an excellent result for the Class under extremely difficult circumstances. The Settlement will provide Class Members with a concrete financial benefit without the very real risk of a no-recovery situation possible if the Litigation were to continue.

56. The pertinent criteria for evaluating the fairness and adequacy of a proposed class action settlement in this Circuit include the following factors: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; (4) the experience of counsel; (5) the relative strength of Lead Plaintiff's case on the merits; (6) the existence of any difficulties of proof or strong defenses Lead Plaintiff is likely to encounter if the case goes to trial; (7) the anticipated duration and expense of additional litigation; (8) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (9) the degree of opposition to the settlement. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991). The first four factors go to the question of fairness, and the other five to the question of adequacy. *Id.* Based on an analysis of these factors, the terms of the Settlement and Plan of Allocation before the Court are fair and adequate, and should be approved.

57. The first factor, the posture of the case at the time the Settlement was proposed, militates in favor of approval of the Settlement. Settlement with Settling Defendants was reached only after Lead Counsel: (a) conducted an extensive investigation into the underlying facts, including all the allegations set forth in the

Complaint; (b) thoroughly researched the law pertinent to the Class Members' claims and the Settling Defendants' defenses; (c) fully considered the likely ability of SOL and the Settling defendants to pay a larger amount in settlement and the likely ability of Lead Plaintiff, through continued litigation or after judgment, to actually recover more for the Class than what has been achieved through the Settlement; (d) consulted with various economic experts to fully evaluate the strength of Lead Plaintiff's claims and the Settling Defendants' defenses, the magnitude of class-wide damages, and the relative weight of each alleged disclosure; and (e) engaged in extensive and protracted arm's-length settlement negotiations with counsel for the Settling Defendants, which included careful analysis of the strengths and weaknesses of the parties' claims and the risks to prevailing through summary judgment, trial and appeal and the cost-benefit of that approach when compared to the Settlement at hand. This case was only resolved following the filing of a detailed Complaint the factual allegations of which required extensive investigation and research.

58.     The second factor, the extent of discovery, also militates in favor of this Settlement. Lead Counsel, acting under the constraints of the PSLRA, which stays formal discovery until after the motion to dismiss stage, nevertheless undertook extensive investigation into their claims through public sources of information, trial records in the criminal matters, and through their professional private investigator.

59.     Lead Counsel also retained the services of an economic and damages consultant to apprise them of the strengths and weaknesses of the Class claims relating to

such issues as loss causation and damages, and to assist in assessing the value of the case.

60.     Thus, the Settlement was reached at a time when Lead Counsel and Lead Plaintiff were more than sufficiently informed of all the relevant facts to make a reasoned decision to settle with the Settling Defendants on the terms now before the Court.

61.     With respect to the third factor, the circumstances surrounding the negotiations, the parties participated in in-depth informal talks and private written and verbal negotiations to reach the proposed Settlement.  The Settlement was reached after these arm's length, hard-fought negotiations.  Counsel for all parties that participated in the settlement negotiations vigorously represented their clients' interests, leaving no doubt that the negotiations were not collusive and pursued in good faith.

62.     The fourth factor, the experience of counsel, also favors the Settlement. Counsel for Lead Plaintiff and Settling Defendants are nationally recognized for their experience and expertise in complex securities class action litigation.  The firm resume of Brower Piven is annexed hereto as Exhibit A to the firm resume of KSF is annexed to the Miller Declaration as Exhibit A.  Lead Counsel presumes the national reputations of the firms representing the Settling Defendants—Akin Gump Strauss Hauer & Feld LLP, Troutman Sanders LLP, and Baker & McKenzie LLP—are known to the Court.

63.     The fifth and sixth factors also favor the Settlement.  While Lead Plaintiff remains confident that she would have succeeded on the Class claims, as in any lawsuit, predicting ultimate victory on the merits is, at best, speculative, and the risk of losing at trial or on appellate review was a relevant consideration and was weighed against the

immediate benefits of settlement. Moreover, even assuming success at trial, here, in addition to the usual and very substantial litigation risks inherent in complex class and securities litigation, the ability to ever recover a greater amount through a judgment was always (and remains) seriously in doubt. Thus, even assuming a complete success on the all issues of liability and damages against the Settling Defendants at trial and through the appellate process for the entire asserted Class, the end of the result could very well have been the recovery of less or nothing for the Class.

64. Regarding the seventh factor—duration and cost of continued litigation— militates in favor of the Settlement. For instance, Michael and Eric Nouri continue to appeal their convictions. Lead Counsel has no doubt that if the Settlement was not reached, and the Litigation proceeded against them, they would have sought a stay until conclusion of their criminal proceedings and, at the very least, would refuse to testify until those proceedings were completed under their Fifth Amendment protections. Thus, there is also no question that the passage of time between the events at issue in this suit and an ultimate trial of the Litigation will have some impact on the availability of testimony and documents.

65. Moreover, if the Settlement is not approved, it will be many months (if not years) before the case would be heard by a jury. Then, regardless of who succeeds on the merits, appellate proceedings would almost certainly follow. Thus, it would be years, even assuming Lead Plaintiff's complete victory in the Litigation, before a final judgment would be entered against all of the Settling Defendants.

66.     Obviously proceeding forward in a litigation posture would necessitate the expenditure of substantial judicial and economic resources without any guarantee of a better resolution for the Class.  And these expenditures would deplete (if not exhaust) any potential Class recovery from the Settling Defendants after trial.  The Settlement avoids these expenditures and provides an immediate recovery for the Class. Therefore, this factor favors the Settlement.

67.     With respect to the eighth factor, as discussed above, the ability of the Settling Defendants to withstand a greater judgment was a major factor in the negotiations of this Settlement.  While SOL is still a going concern, it remains in severely straitened financial condition, and the Settlement was crafted to maximize the Class's recovery in the light of SOL's financial condition and apparent prospects.  It is extremely unlikely that the Class would be able to recover more from a litigated judgment than was recovered by the negotiated Settlement.

68.     The ninth factor also weighs in support of approval of this Settlement.  As noted above, the Notice has already been disseminated to more than 3,400 Class Members, and only one putative Class Member has posed an objection to it. An objection, representing a tiny percentage of Class Members, is alone so small as to indicate that the vast majority of Class Members approve of the Settlement.

69.     Nevertheless, as mentioned above, the deadline to object to the settlement does not expire until April 18, 2011.  Therefore, following expiration of the objection deadline, Lead Counsel will supplement their filings to address all objections that have

25

been timely received.

## THE PLAN OF ALLOCATION IS FAIR AND EQUITABLE

70. Lead Counsel worked extensively with an expert damages and economics consultant to prepare a fair and rational plan to allocate the Net Settlement Fund to Authorized Claimants that would be readily comprehensible to Class Members. Lead Counsel also worked with the Claims Administrator to ensure that the Plan of Allocation would be straightforward to administer, thus reducing the risk of mistakes in the final distribution to eligible claimants.

71. Pursuant to the Preliminary Approval Order and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a proper Proof of Claim. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of expenses, the Net Settlement Fund will be distributed according to the Plan of Allocation.

72. If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Proof of Claim forms.

73. The proposed Plan of Allocation provides:

> The Settlement Fund, less all taxes and approved costs, fees, and expenses (the "Net Settlement Fund") shall be distributed to Class Members who submit acceptable Claim Forms ("Authorized Claimants")… The Claims Administrator shall determine each Authorized Claimant's pro rata share of the Net Settlement Fund based upon each Authorized Claimant's recognized loss. The recognized loss formula is not intended to be an estimate of the amount a Class Member might have been able to recover after a trial,

26

nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement. The recognized loss formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. . . Any cash distribution and allocation of the common stock component of the Settlement Fund will be made proportionally to each Authorized Claimant on a percentage basis, calculated by the relationship each Claimant's recognized loss bears to the value of the Settlement Fund at the time of distribution. The common stock component of the Settlement Fund will be valued based on the market price of the shares at the time of distribution.

74. An Authorized Claimant's Recognized Claim will be calculated as follows:

- Recognized losses are available for publicly traded shares of SOL common stock purchased between May 2, 2005, and September 28, 2007, inclusive.

- For shares purchased between May 5, 2005, and January 16, 2006, inclusive:

   A. and sold before January 17, 2006, recognized loss will be zero;

   B. and sold between January 17, 2006, and September 9, 2007, recognized loss per share will be the lesser of:

      (i) $6.75; and

      (ii) the price paid less the price received.

   C. and sold between September 10, 2007, and December 10, 2007, recognized loss per share will be the lesser of:

      (i) $8.87; and

      (ii) the price paid less the price received.

   D. and held at the close on December 10, 2007, recognized loss per share will be the lesser of:

      (i) $8.87; and

      (ii) the price paid less $2.16.

- For shares purchased between January 17, 2006, and September 10, 2007:

   A. and sold between January 17, 2006, and September 9, 2007, recognized loss will be zero;

B. and sold between September 10, 2007, and December 10, 2007, recognized loss per share will be the lesser of:

    (i) $2.12; and

    (ii) the price paid less the price received.

C. and held at the close on December 10, 2007, recognized loss per share will be the lesser of:

    (i) $2.12; and

    (ii) the price paid less $2.16.

- For shares purchased between September 11, 2007, and September 28, 2007, inclusive, recognized loss will be zero.

- For call options purchased or put options sold between May 2, 2005, and September 10, 2007, inclusive, recognized loss will be ten percent (10%) of the amount resulting from a standardized Black Shoals method calculation.

- In no event shall funds distributed on claims for purchase or of call options or sale of put options exceed one percent (1%) of the funds available for distribution.

75.    The formula set forth above is intended to mirror the formula that Lead Plaintiff was most likely to present at trial to prove Class members' damages on the merits. It takes into consideration, *inter alia*, the movement in SOL trading prices during the Class Period and excludes movements or other factors that would not be compensable at trial. As such, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among Class Members.

## LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES IS REASONABLE

76.    The amount that Lead Counsel are seeking as attorneys' fees is $33^{1}/_{3}$% of the Gross Settlement Fund, which percentage is to be spread equally between the Stock Contribution, the Cash Contribution, and any value obtained for the Class through pursuit

of the Assigned Claim. Lead Counsel respectfully submit that such amount is fair and reasonable and comparable to a market-rate fee as contemplated under the PSLRA's provisions for selection of Lead Plaintiffs and Lead Counsel.

77.     As set forth in the accompanying memorandum of law in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses, Lead Counsel are also requesting $33^{1}/_{3}\%$ in fees, or one third of the cash portion of the Settlement, one third of the stock portion of the Settlement, and one third of any future recoveries obtained by SOL from its prosecution of its claims in the Direct Action.

78.     The Fourth Circuit has held that in exercising its discretion in awarding fees, district courts should consider the following criteria: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the customary fee; (5) whether the fee is fixed or contingent; (6) the amount involved and results obtained; (7) the experience, reputation, and ability of the attorneys; and (8) awards in similar cases. *See Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (adopting the factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). An analysis of these criteria demonstrates that the requested fee is fair and reasonable.

79.     With respect to the first factor, Lead Counsel have worked extremely hard to develop this case. In the course of aggressively pursuing the rights of the Class, Lead Counsel have conducted this litigation in a coordinated and well-organized fashion to achieve successes that had might otherwise elude the Class. In so doing, Lead Counsel

29

devoted both substantial attorney resources and financial resources to the case. They conducted an extensive investigation and thoroughly research the strengths and weaknesses of the claims. Lead Counsel also participated in protracted settlement negotiations spanning almost a year in order to achieve this Settlement. In total, Lead Counsel and Liaison Counsel expended 1,334.50 hours on this Litigation, which represents a $773,421.50 lodestar (*i.e.,* their hourly rates multiplied by the hours expended).

80. Thus, Lead Counsel achieved this favorable result for the Class after a significant investment of time and financial resources, at great risk of no recovery at all. They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion where less persistent attorneys, faced with the unusual risks and obstacles here might have abandoned the action. The requested fee is reasonable based on the quality of Lead Counsel's work and the benefit obtained for Class Members.

81. As discussed above, the tasks undertaken by Lead Counsel began with a successful disputed motion appointing of Mary Jane Beauregard as Lead Plaintiff, which resulted in approval of their selection of Brower Piven and KSF as Lead Counsel. Thereafter, Lead Counsel conducted an extensive factual and legal investigation into SOL and the conduct of the defendants underlying Lead Plaintiff's claims ultimately alleged in the operative Complaint, including utilizing an economics expert.

82. In the period following the filing of the Complaint, as detailed above, there

followed detailed and protracted settlement negotiations and complex motion practice on questions of consolidation of this Litigation with the Direct Action, a motion to dismiss this Litigation by Sherb, a motion to strike or stay the Sherb motion to dismiss, and a motion for award of attorneys' fees to non-lead counsel by a party that was not appointed as Lead Plaintiff. Throughout these steps, Lead Counsel continued to vigorously pursue the interests of the Class and craft and preserve a Settlement which would secure immediate benefit for the Class and avoid the paramount risks of continuing litigation.

83.    Lead Counsel's in-person, telephonic and electronic negociations with counsel for the Settling Defendants in an effort to resolve the Litigation involved extensive discussion of the strengths and weaknesses of each party's arguments, the appropriate measure of damages, the financial condition of the Settling Defendants, and the effect of the government criminal investigations into certain of the defendants. Bolstered by this strong understanding of the strengths and weaknesses of the case, as well as the other risks involved here, the parties reached an agreement in principle to settle the Litigation.

84.    Thereafter, on June 21, 2010, Lead Plaintiff filed the Stipulation and proposed Preliminary Approval Order with the notice documents. Following execution of the Stipulation, Lead Counsel negotiated a highly beneficial; arrangement with the claims administrator to further conserve resources and preserve the Settlement for distribution to Class Members. Since that time Lead Counsel has closely supervised the notice and administration process, and monitored the work of GCG.

85.     As discussed above, Lead Counsel faced significant risks in pursuing this Action.  This was not a case where any recovery was assured.  Lead Counsel undertook this Litigation in a wholly contingent basis and was dependent upon a successful result and an award by this Court to recover any compensation.  From the outset, Lead Counsel understood that they were embarking on complex, expensive, challenging, and lengthy litigation (with no guarantee of compensation for the investment of time, money, and effort the case would require).  In undertaking that responsibility, Lead Counsel not only needed to maintain its usual overhead, including rents, salaries, utilities and the like, but were obligated to assure that there were sufficient resources in attorneys to prosecute the Litigation and that there was sufficient funds to bear the considerable out-of-pocket costs a case such as this entails.

86.     With respect to the second factor, this case was unusually complex in that it involved allegations not only against SOL (which was a passive actor in the underlying market manipulation), but against the allegedly bribed stockbrokers and their employers as well.  The procedural history of this case has also been particularly complex, with certain defendants engaging in settlement negotiations while others were in the course of moving to dismiss.  The pursuit of the Direct Action, which is separately on-going, overlayed an unusual additional layer of complexity.

87.     With respect to the third and seventh factors, Lead Counsel have national reputations and are among the most experienced and highly regarded plaintiffs' securities litigators in the country.  *See* Exhibit B hereto, Ex. A; Exhibit C hereto, Exhibit A.  Few

lawyers have the experience and knowledge to develop and negotiate a novel settlement of the type in this case.

88. The Settling Defendants are represented by outstanding attorneys at premier national defense law firms, Akin Gump Strauss Hauer & Feld, LLP, Troutman Sanders LLP, and Baker & McKenzie LLP. That Lead Plaintiff was faced with opposition of this caliber and yet were able to obtain a settlement of the kind offered here is only further evidence of the quality of representation the Class has received.

89. Regarding the fifth[8] factor, because of the nature of a contingent practice, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. The financial burden on counsel working on a contingent fee retainer is far greater than on a firm that is paid hourly on a current and ongoing basis.

90. When Lead Counsel undertook to represent Lead Plaintiff and the Class in this matter, it was with the knowledge that their firms would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for their efforts. Lead Counsel were aware that the only way they would be compensated was to achieve a successful result.

91. Furthermore, in consideration of the sixth factor, in this particular case, there was a significant risk of no recovery. Recovery of damages in any securities case is

---

[8] The fourth and eighth factors are discussed in full in the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Partial Class Settlement, Plan of Allocation, and Award of Attorneys' Fees and Expenses

risky because it depends, to a great extent, on a battle of experts at trial and such battles are notoriously uncertain. The Settlement, of course, provides a partial recovery of those damages with no further risk, and leaves open the possibility that Lead Plaintiff and the Class will recover additional funds through the continuation of this Litigation against the Non-Settling Defendants as well as receive whatever recoveries SOL may achieve in the Direct Action.

92. As to the reaction of the Class to the request, the Notice to the Class stated that Lead Counsel would request up o one-third of the Gross Settlement Fund as compensation for their efforts in prosecuting the Litigation and obtaining the Settlement. As of this date, no Class Member has objected to the amount of attorneys' fees requested by Lead Counsel. The absence of objections (or even comment) regarding Lead Counsel's request for attorneys' fees from those most interested—the Class Members who are paying those fees—speaks volumes for the reasonableness, under the circumstances here, of that request.

93. Lead Counsel also suggests that public policy considerations support the requested fee award. Lead Counsel shouldered all of the risk of committing substantial resources to the litigation of this Action, and of working long hours in a heavily contested matter, notwithstanding significant uncertainty as to whether the Action would ultimately succeed.[9] Absent reasonable compensation for their successful efforts, there can be little

---

[9] On October 12, 2010, counsel for Robyn Gooden, the named plaintiff in the first-filed complaint in this Litigation, moved for an award of attorneys' fees and expenses (the "Federman & Sherwood Motion"), for time and expenditures researching and drafting the initial complaint. On November 5, 2010, Lead Plaintiff filed an opposition to the

doubt that attorneys in the future will be less likely to be willing to undertake such high-risk, high cost litigation on a contingent basis. If attorneys unwilling to undertake such litigation, it will not be long before fraud is even more pervasive in the securities markets than is already the case. Indeed, it is well-known that the SEC is an overworked, underfunded agency. Without the willingness and ability of private attorneys to fill the void left by governmental enforcement of the securities laws on a contingent basis, the purposes of the federal securities laws could not be vindicated

## CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF EXPENSES IS REASONABLE

94.     As detailed in the chart below, Brower Piven has incurred a total of $20,555.88 in unreimbursed expenses in connection with the prosecution of this Litigation. The categories of those expenses is as follows:

| Expense Category | Total |
|---|---|
| Expert | $9,480.00 |
| Filing Fees/Pacer/PSLRA Notice | 485.28 |
| Service | 3,524.75 |
| Telephone/Telecopier | 3.88 |
| Online/Computer & Legal Research | 1,754.81 |
| Postage/Express Mail/Couriers | 440.80 |
| Photocopies and Printing | 2,949.25 |
| Travel, Food and Hotels | 1,917.11 |
| **TOTAL** | **$20,555.88** |

95.     The expenses pertaining to this Litigation are reflected in the books and

---

Federman & Sherwood Motion, and Federman & Sherwood filed a reply in support of its motion on November 19, 2010. The time for Federman & Sherwodd to seek attorneys' fees and /or expenses expires on April 4, 2011. lead Plaintiff and Lead Counsel will supplement their responses to the Federman & Sherwood fee and expense request after they have an opportunity to review whatever else Federman & Sherwood may submit in support of its requests.

records of this firm. These books and records are prepared from expense vouchers, check records, and other documents and are an accurate record of the expenses.

96.     The expenses of Lead Counsel and Liaison Counsel are detailed in the individual law firm declarations annexed hereto as Exhibits B, C and D.

97.     Lead Counsel believes that the expenses incurred are reasonable and were necessary for the effective and efficient prosecution of this Litigation. Further, as demonstrated above, the items of expense are those typically incurred in litigation of this nature.

98.     Finally, the Notice informed Class Members that Lead Counsel would seek reimbursement of expenses up to $100,000 for prosecuting the Litigation and to date no Class members has posed an objection to that request.

## CONCLUSION

99.     For the foregoing reasons, Lead Counsel submits that the Court should grant Lead Plaintiff's motion for an Order: (1) finding that the forms and methods for notice to the Class met the requirements of Fed. R. Civ. P. 23(c) and (e), and due process; (2) granting final certification, for the purposes of effectuating the Settlement, of the Class; (3) granting final approval of the Settlement on the terms and conditions set forth in the Stipulation; (4) granting approval of the Plan of Allocation of Settlement proceeds; and (5) granting Lead Counsel an award of Attorneys' fees equal to one third of the Gross Settlement Fund and all future recoveries received by the Class from the recoveries obtained by SOL on its claims against the Non-Settling Defendants, and reimbursement

of Lead Counsel's litigation expenses in the amount of $20,555.88, plus interest on those amounts until paid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of April, 2011 at New York, New York.

_____/s/ David AP Brower_____
DAVID A.P. BROWER